[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-16150
_____

Agency No. A073-578-132


MU YING WU,
RU CHENG ZHANG,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(March 18, 2014)

Before CARNES, Chief Judge, HULL and COX, Circuit Judges.

HULL, Circuit Judge:

Mu Ying Wu and her husband Ru Cheng Zhang, natives and citizens of China, petition for review of the Board of Immigration Appeals's ("BIA") decision, affirming the Immigration Judge's ("IJ") denial of Wu's application for asylum and withholding of removal and Zhang's application for asylum and withholding of deportation. Wu and Zhang entered the United States illegally and were ordered removed (Wu in 1999) and deported (Zhang in 1997). After the issuance of these removal and deportation orders, they married in 1999 and had three U.S.-born children in 2000, 2002, and 2005, respectively.

In 2004 and 2005, Wu and Zhang both filed multiple motions to reopen their immigration cases and filed asylum applications claiming future persecution, including sterilization, if returned to Fujian Province, China. The motions were denied, and in 2007, they again filed several motions to reopen their cases. The BIA granted Wu's and Zhang's last 2007 motions to reopen and remanded their cases to the IJ to consider the authenticity of their evidence and for further consideration of their asylum claims.

In 2010, after a hearing, the IJ denied Wu's and Zhang's asylum applications, and in 2012, the BIA dismissed their appeal. After careful review, and with the benefit of oral argument, we deny their petition.

## I.  BACKGROUND FACTS

**A.     1996-1999 Immigration Proceedings**

2

On August 4, 1994, Zhang illegally entered the United States without inspection. In May 1996, Immigration and Naturalization Services ("INS")[1] issued an Order to Show Cause ("OSC"), charging Zhang as deportable pursuant to Immigration and Nationality Act ("INA") § 241(a)(1)(B), 8 U.S.C. § 1231(a)(1)(B), for entering the United States without inspection. Zhang conceded the deportation charge. Zhang filed an application for voluntary departure. In September 1997, the IJ granted Zhang's application for voluntary departure until May 10, 1998, and entered an alternate order of deportation if he did not depart by that time.

On November 28, 1997, Wu illegally entered the United States without a valid entry document. In December 1997, INS issued a Notice to Appear, charging Wu as removable, pursuant to INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), for not possessing or presenting a valid entry document. Wu conceded the removal charge. An IJ ordered Wu removed in January 1999, and the BIA affirmed the IJ's removal order.

Despite Zhang's voluntary departure order and Wu's removal order, both remained in the United States. The two met one another, and on June 14, 1999, they married. They subsequently had three children, two girls and one boy. The

---

[1]On March 1, 2003, INS ceased to exist as an agency with the Department of Justice and its enforcement functions were transferred to the Department of Homeland Security.

daughters were born on November 7, 2000 and February 15, 2002, respectively, and the son on October 30, 2005.

## B.    2004-2005 Applications for Asylum

Throughout 2002 until 2005, Wu and Zhang unsuccessfully attempted to reopen their immigration proceedings.

In June 2004, in connection with these efforts, Wu filed an application for asylum and withholding of removal, and in November 2005, Zhang filed an application for asylum and withholding of deportation.  Both Wu and Zhang claimed that they feared that they would be sterilized if returned to China because the U.S. births of their children violated China's family planning policy.  Wu and Zhang claimed that they would be returned to Tingjiang Town, Fujian Province, China.[2]

## C.    2007 New Motions to Reopen and Consolidation

In 2007, Wu and Zhang filed new motions to reopen their immigration proceedings based on changed country conditions.  Both motions to reopen claimed that, on June 9, 2006, Zhang's mother received an "Official Document"

---

[2]Zhang's initial asylum application, which he filed in August 1994 and withdrew in 1997, states that he was from Tingjiang Town.  However, his and Wu's later applications state that they are from Fuzhou City.  Tingjiang Town is located north of Fuzhou City, but both are in Fujian Province.  Evidence in the record provides that asylum applicants occasionally list Fuzhou City as their home, despite the fact that they are actually from a town "some miles away."  At oral argument, counsel clarified that Wu and Zhang claim that they would be returned to Tingjiang Town.

that purported to be from the Birth Control Office of Tingjiang Town, Mawei District, Fuzhou City ("2006 Tingjiang Document"). The 2006 Tingjiang Document ordered the sterilization of either Wu or Zhang when they returned to China. Based on this order, Wu's and Zhang's new motions claimed that circumstances in China had changed since they were first ordered removed/deported, as well as since their last motions to reopen were denied in 2004 and 2005.

Their new 2007 motions to reopen included a translated copy of the 2006 Tingjiang Document. And, this document states that it was drafted in response to an inquiry Wu and Zhang made concerning family planning policies. The document sets forth Wu and Zhang's background, noting their genders, nationalities, dates of birth, their village, and current location (the United States). The 2006 Tinjiang document further states:

> According to 'the Birth Control Regulation of Fujian Province', Article 5 and Article 6, citizens who gave birth to one child are target of [intrauterine device ("IUD")] insertion; who gave birth to two children will be sterilized. Although you are in the United States now, still, a citizen of China and must be listed as target of sterilization. The exception of sterilization only apply to the United States citizen, permanent resident and whom with a Master/Ph.D. degree. If you can not meet the above exceptions, you must report to this Birth Control Office to be sterilized within one week upon your return to China. Hereby noticed.
> The Birth Control Office of Tingjiang Town, Mawei District of Fuzhou City

The 2006 Tingjiang Document purportedly was under seal.

5

In addition, Wu's motion to reopen included (1) a 2006 Shouzhan Town document that was purportedly issued by the Tangyu Villagers' Committee of Shouzhan Town, Changle City and that states that "the birth control method after the birth of one child" was the insertion of an IUD and after the "birth of two children" was sterilization; (2) a November 9, 2006 statement from Wu's aunt, Xiang Hua Liu, in China, who noted that, in March 1991, after having two children, she was forcibly sterilized in "Changle County"; and (3) an October 1995 document that Wu claimed was the "sterilization certificate" of her cousin, Hui Ying Liu, in China, and that states that Liu had a "bilateral tubal ligation" in Tingjiang Town.

In filing their 2007 motions to reopen, Wu and Zhang also relied on their 2004 and 2005 prior applications.

In August 2007, the BIA granted Wu's and Zhang's last 2007 motions to reopen and remanded their cases to the IJ. The BIA instructed the IJ, on remand, to address the authenticity of the evidence presented with Wu's and Zhang's motions, their credibility, and eligibility for relief. In May 2008, Zhang's case was consolidated with Wu's case.

In 2010, the IJ held a merits hearing. We review the documentary evidence and Wu's testimony at the hearing.

**D.    DHS's Documentary Evidence**

On remand before the IJ, the Department of Homeland Security ("DHS") filed background evidence concerning China's family planning law, including, but not limited to: (1) the U.S. State Department's 2009 Human Rights Report for China ("2009 Report"); (2) the U.S. State Department's 2007 Profile of Asylum Claims and Country Conditions for China ("2007 Profile"); and (3) a submission of compiled evidence regarding population control claims arising out of the birth of children in the United States. Included in that submission are: (1) an excerpt from the U.S. Department of State's 2005 Profile of Asylum Claims and Country Conditions for China ("2005 Profile"); (2) an April 2002 report by the United Kingdom's government; (3) various correspondence from the Fujian Provincial Birth Planning Committee ("Fujian Committee"); and (4) various newspaper articles. We briefly summarize the information gleaned from this evidence.

1.      China's National Population and Birth Planning Law

The DHS's evidence indicates that China's law and policy forbids sterilization, but requires social compensation fees if a couple has more than one child. Specifically, the 2007 Profile describes China's National Population and Birth Planning Law enacted in September 2002 (the "family planning law"). This law standardizes the implementation of China's family planning policy. The family planning law (1) grants most married couples the right to have a single child, (2) allows eligible couples to have a second child, (3) requires couples to use

7

birth control measures, and (4) requires parents of an "unapproved child" to pay a "social compensation fee." China's family planning law delegates to the provinces the responsibility for drafting the law's implementing regulations, including establishing a scale for the assessment of social compensation fees. Thus, "local enforcement and important aspects of local regulations vary significantly from place to place."

Both the 2007 Profile and the 2009 Report state that China's central government policy prohibits the use of physical coercion to compel persons to submit to sterilization or abortive procedures. The 2007 Profile acknowledges that U.S. diplomats in China "have heard reports" that local officials occasionally employed illegal means, such as forced sterilizations, in order to meet birth planning targets and to retain their jobs. The 2009 Report states that, "[i]n the case of families that already had two children, one parent was often pressured to undergo sterilization." And, "[t]he penalties [for violating China's family planning policies] sometimes left women with little practical choice but to undergo abortion or sterilization."

The 2009 Report also provides that social compensation fees imposed under China's family planning law could "reach 10 times a person's annual disposable income." A 2007 newspaper article from the Washington Post, citing the head of the Chinese National Population and Family Planning Commission, notes that

8

"fines" for violations of the family planning regulations could be reduced or waived for "poor persons."

2.    Fujian Province's Enforcement of China's Family Planning Law

With respect to Fujian Province in particular, the 2007 Profile states that the Fujian Committee reported no cases of forced sterilization in the last ten years, and local physicians reported that they had seen no signs of forced sterilization since the 1980s.

Similarly, the April 2002 report by the United Kingdom's government states that: (1) most authorities agreed that Fujian Province was less strict in enforcing its birth control policy than any other province in China except one; (2) to enforce the birth control policy, Fujian Province used incentives rather than forced abortions and sterilizations; and (3) one-third of families in Fujian Province had three or more children.  The 2002 report also states that Fujian Province government officials fined the "the parents of 'out-of-plan' children . . . 60-100% of the family's annual income."  And, unpaid fines could result in the confiscation or destruction of homes and personal property by local authorities.

The 2007 Profile states that the Fujian Committee imposed social compensation fees on those who did not comply with the birth planning laws, but the Fujian Committee indicated that couples unable to pay the required social compensation fee "immediately may be allowed to pay in installments."  Although

9

local birth planning committees could sue families who refused to pay the fees, the committees could not garnish the families' wages.

There was some conflicting evidence too.  The 2007 Profile also states that: (1) there was a 2006 report of a forced sterilization in Fujian Province; (2) hundreds of asylum applicants from the province claimed that forced sterilization practices continued; (3) U.S. Consulate General officials visiting the province "found that coercion through public and other pressure" had been used to enforce family planning policies, "but they did not find any cases of physical force employed in connection with abortion or sterilization"; and (4) the province required unspecified "remedial measures" for out-of-plan pregnancies.

3.     China's Treatment of U.S.-Born Children

Specifically, correspondence from the Fujian Committee, dated October 13, 2006, to DHS provides that a family with U.S.-born children was treated differently than a family with Chinese-born children.  This correspondence was included as an appendix to the 2007 Profile.  This correspondence discusses U.S.-born versus Chinese-born children for family planning policies.  It explicitly states that: (1) a child born in the United States to a Chinese resident was not considered a permanent resident of China unless the child's permanent residency was

10

established upon the child's return to China;[3] (2) "when enforcing birth policy rules . . ., the [non-permanent resident] child was not counted"; and (3) Villagers' Committees did "not have the right to make decisions on family planning disposition[s]."

Additional correspondence from the Fujian Committee, dated January 17, 2007, adds to the 2006 correspondence by stating that, when a foreign-born child established permanent residency in China, the child counted "when enforcing birth policy rules."

Likewise, the 2007 Profile indicates that U.S.-born children would not count towards China's family planning policy unless they were registered as Chinese permanent residents. If a parent decided to register his/her foreign-born children as permanent Chinese residents in order to gain access to public services, the children's registration "could trigger sanctions and economic penalties under the relevant laws and regulations."

The 2007 Profile also provides that U.S. officials in China were not aware of any official policy, at either the national or provincial levels, that "mandated" the sterilization of one partner of couples that had given birth to two children, with at

---

[3]According to the 2007 Profile, children with a "Chinese household registration" are recognized as Chinese permanent residents. A household registration officially documents the "legitimate residence of a person," as well as the allocation of services, such as free education and other social benefits.

11

least one child being born abroad.  The 2005 Profile states that U.S. officials were unaware of any cases of forced sterilization upon such couples' return to China.[4]

The 2007 Profile notes that documentation from China, particularly from Fujian Province, was subject to widespread fabrication and fraud.  This fraud extended to documents that purportedly verified birth control measures and notices from public security authorities.  The 2007 Profile observes that "[t]he existence of this fraud has been established by direct investigation by U.S. consular officers in China."

**E.    Wu and Zhang's Documentary Evidence**

As their evidence, Wu and Zhang filed (1) a February 10, 2009 "Fuzhou City Mawei District Tingjiang Town People's Government Document" that was purportedly signed by the Tingjiang Town Family Planning Office ("2009 Tingjiang Document"); (2) a February 2009 "Fuzhou City Mawei District Tingjiang Town People Government . . . Notice" that was purportedly signed by the Baimei Village Committee ("2009 Villager's Committee Notice"); (3) a 2010 letter from Zhang's mother; and (4) a 2009 letter from Zhang's cousin, Langying Liu in China, who gave birth to a second child in 2008.

---

[4]An excerpt from the 2005 Profile, however, provides that a family with a U.S.-born child or children received "no special treatment" under China's family planning laws unless one of the parents had residency rights in another country.

The 2009 Tingjiang Document indicates that it was a response to Wu and Zhang's prior inquiry about the town's family planning policy.  The 2009 Tingjiang Document states that: (1) Tingjiang Town strictly enforced Fujian Province's Population and Family Planning Policy; (2) "all Chinese citizens who have one child are subjected to IUD insertion; who have two children are subjected to be sterilized"; (3) because Wu and Zhang had three children without approval or birth permit, they had to appear at a province hospital for sterilization and pay "according to 60% to 1 time of each person average net income and 2 to 3 times of social support fees"; and (4) if they registered their children, Wu and Zhang had to follow the family planning policy.

The 2009 Villager's Committee Notice states that: (1) an investigation revealed that Wu and Zhang had three children and had violated Fujian Province's Population and Family Planning Policy; and (2) Wu and Zhang should report to the family planning office, within one month of receipt of the notice, to be sterilized and to pay a social support fee.

Zhang's mother's 2010 letter states that: (1) a family planning office had investigated Zhang's situation and determined that Wu and Zhang had violated the family planning policy; and (2) officials sent out a notice for sterilization and came to Zhang's mother's house to determine if Zhang had returned to China.

13

Cousin Liu's 2009 letter states that: (1) officials told her she had to be sterilized or her children would not be registered; (2) officials told her to pay a fine, but she refused to do so; (3) officials thus took valuable items from her home to pay the fine; and (4) Liu acquiesced to the sterilization in order to register her children.  A document, dated July 7, 2009, from Changle City certified that Langying Liu had been sterilized.  There is no claim that Liu's children were U.S.-born.

## F.    2009 DHS Report on the 2006 Tingjiang Document

On June 9, 2009, prior to the merits hearing, the DHS filed a report concerning the 2006 Tingjiang Document.  The report states that, following the DHS's "[m]icroscopic, instrumental and comparative examination" of the Tingjiang document, the DHS had concluded that the document was "unsuitable for authentication."  The report found: (1) "[t]he diversity of forms, letterheads, printing processes, stamp impressions, authorization signatures, handwriting and typewriting used for many types of locally issued documents . . . precludes the maintenance of a comprehensive set of specimens and/or reference material"; (2) "[a]n examination revealed that the document was produced with inkjet printing technology," which "can be easily reproduced or counterfeited without detection"; (3) because a document produced in that manner could be easily reproduced or counterfeited without detection, conformity of the document to a known specimen

14

would be of limited value in determining its authenticity; and (4) no physical evidence showed that the information in the document was altered.

## G.     Wu's Testimony at 2010 Merits Hearing

At the July 27, 2010 merits hearing, Wu testified that she wanted one more child, and that Wu and Zhang did not agree to be sterilized.  If removed to China, Wu would not register her three children "in the household registration."  Wu said the Chinese government would not allow registration because she violated the family planning policy.

According to Wu, although her U.S.-born children would not be registered, they would still count towards the number of allowable children under China's family planning policy.  On cross-examination, DHS asked Wu how she could reconcile her testimony with evidence from the Chinese government stating that unregistered children were not counted for the purposes of China's family planning policies.  Wu responded that she did not understand the question.

Wu testified that, at an unspecified time, her children had already visited China, and, instead of visas, the Chinese government issued them "travel documents."  Wu said only Chinese citizens could use travel documents, as opposed to visas.  Thus, Wu believed that the Chinese government considered her children Chinese citizens.  Wu acknowledged, however, that all three children possessed and had used U.S. passports when they visited China.

15

Wu testified that, if she returned to China, she would be forcibly sterilized. Wu knew this because, at some point after her removal proceedings started, she had Zhang write a letter to the "Village Birth Control Bureau" asking what would happen to her and Zhang if they returned to China. The response[5] to Wu's letter states that she and Zhang had violated China's family planning policies, and the Bureau would arrest, sterilize, and fine Wu and Zhang. The Bureau delivered the letter to Zhang's mother, who then sent it to Wu and Zhang. Wu's aunt, Xiang Hua Liu, Zhang's cousin, Langying Liu, and "a neighbor" had each individually given birth to two children in China and then were forcibly sterilized. In April 2010, Zhang's sister, in China, was forced to abort her second child.

Wu further testified that, if she returned to China, she would be fined for her violation of the family planning policy. According to Wu, Zhang's cousin violated the family planning policy and had to pay 60,000 RMB, which was approximately $10,000.[6] In China, Zhang qualified to receive monthly wages of around 500 RMB because he had no education and would have to work secretly in a field or a restaurant, as he would not have a "household registration record." Wu would not work.

---

[5]It is unclear from the record whether Wu is referring to the 2006 and 2009 Tingjiang Documents or to another document not in the record.

[6]Wu did not specify if she was referring to cousin Langying Liu or some other cousin of Zhang's.

In China, Wu's monthly expenses would be 2,000 RMB, but the average monthly expenses for a Chinese family were between 800 RMB and 1,000 RMB. Wu's family's expenses would exceed other Chinese families' expenses because Wu's family would lack a household registration and thus would have to pay for their children's studies and healthcare.

At the time of the hearing, in the United States, Zhang worked in a restaurant earning $3,500 to $3,700 a month. Wu and Zhang had no savings and owned a house with a $220,000 mortgage and a $150,000 value.[7]

## H.    IJ's 2010 Decision

In the 2010 oral decision, the IJ found that Wu's testimony itself was credible. The IJ determined, however, that Wu's 2006 Tingjiang Document— indicating that Wu and Zhang would be sterilized—was entitled to "little or no weight" because, inter alia, (1) it was not authenticated, and (2) it was created and obtained for the purpose of these immigration proceedings. The IJ found that the document "was manufactured solely for this case." Citing the 2007 Profile, the IJ also found that a Villager's Committee did "not have the right to make decisions on family planning disposition[s]" and a certificate issued by that Committee "should be deemed ineffective."

---

[7]Zhang did not testify.

17

The IJ also observed that there was widespread document fraud in China, particularly in Fujian Province. This widespread fraud included the fabrication of documents that purportedly verified "birth control measures," and the fabrication of "notices from public security authorities."

As to sterilization, the IJ found that China's central government's policy prohibited the use of physical coercion to compel persons to submit to sterilization or abortion. Although there was evidence that local planning officials had, at times, used physical coercion to meet birth limitation targets, the evidence did not show that use of coercion occurred routinely. And, according to the 2007 Profile "there ha[d] been no cases of forced sterilization in Fujian in the last ten years" and the law prohibited "the use of physical coercion to compel persons to submit to abortion or sterilization." While coercion through public and other pressure had been used, there were no cases found of physical force employed in connection with abortions or sterilizations after U.S. officials visited Fujian Province.

The IJ also found that Wu had not presented any evidence of a Chinese national returning with two or more U.S.-born children and being forcibly sterilized. The IJ cited and relied on the BIA's prior decision in Matter of H-L-H-, where the BIA determined that, to be eligible for asylum relief (i.e., by showing, inter alia, an objectively reasonable well-founded fear of future persecution), the respondent must show "a reasonable possibility that Chinese Government officials

18

would enforce the family planning policy against her through means constituting

persecution." See Matter of H-L-H-, 25 I. & N. Dec. 209, 211-12 (BIA 2010)

(citing the BIA's 2007 decision in In re J-H-S-, 24 I. & N. Dec. 196 (BIA 2007),

where the BIA used this same general test, although separating the test into three

prongs).[8]

Further, the IJ noted that the BIA had previously discussed the same 2007

Profile and the same October 13, 2006 correspondence from the Fujian Committee,

both of which were in the record in Wu's case. The IJ here observed that those

documents showed that (1) children born in the United States to a Chinese national

are not considered as Chinese mainland residents if they have not gone through the

formal process to register and become permanent residents and (2) such U.S.-born

children will not be counted against the number of children allowed under China's

family planning law if they were not registered.

The IJ concluded that, if Wu and Zhang were to be penalized at all for

having a second child while outside of China, the only sanctions would be

---

[8]In In re J-H-S-, the BIA stated that, to demonstrate an objectively reasonable well-founded fear, an alien must show: (1) "proof of the details of the family planning policy relevant to [her]"; (2) "the alien violated the policy"; and (3) "the violation of the family planning policy would be punished in the local area in a way that would give rise to an objective fear of future persecution." See In re J-H-S-, 24 I. & N. Dec. at 198-99, petition denied sub. nom., Shao v. Mukasey, 546 F.3d 138, 142-43, 169-70 (2d Cir. 2008) (finding no legal error in in the BIA's three-prong test).

While Matter of H-L-H- was later overruled on other grounds by Hui Lin Huang v. Holder, 677 F.3d 130 (2d Cir. 2012) (concluding the IJ's finding of a future event is not reviewed de novo by the BIA, but for clear error), the Second Circuit did not disturb the In re J-H-S- test that was cited in Matter of H-L-H-, 25 I. & N. Dec. at 211-12 (referring to the BIA's "three-part inquiry" in Matter of J-H-S-, petition denied sub. nom., Shao, 546 F.3d at 142-43).

economic.  The IJ stated that there was "wide variation in the amount of social compensation fees and the severity of hardship they impose for out-of-plan births." The IJ determined that (1) Wu had "speculated" that Zhang's cousin was fined 60,000 RMB; (2) that the record contained "scant" information regarding Wu's financial situation; and thus (3) the evidence was insufficient to establish that the fine would be so severe as to rise to the level of future economic persecution.

The IJ also observed that, if Wu's children were not registered as permanent residents (and thus did not count towards the number of children allowed under China's family planning law), they would be ineligible for free public education and other social benefits.  The IJ determined, however, that those benefits were still available, just at a cost, which did not amount to future economic persecution.

The IJ also determined that the letters from Wu's relatives did not provide substantial support for her contention that she would be subjected to forcible sterilization or sanctions rising to the level of persecution.  The IJ explained that: (1) the authors of the letters were "interested," "biased," and not subject to cross-examination; (2) there was no way to determine whether the letters' contents were true; and (3) the authors were not similarly-situated to Wu because they did not claim to have U.S.-born children.  The IJ stressed that the letters did not involve U.S.-citizen children.

20

The IJ concluded that Wu and Zhang failed to show (1) their eligibility for asylum because they had not shown that they had an objective well-founded fear of future persecution and (2) Wu's eligibility for withholding of removal.[9]  The IJ denied Wu's and Zhang's applications for relief and ordered them removed.

## I.    BIA Appeal

On August 26, 2010, Wu and Zhang filed a notice of appeal with the BIA. Wu and Zhang argued that they satisfied their burden of showing that there was a reasonable probability that they would be forcibly sterilized and would face economic penalties amounting to persecution if they returned to China.[10]

On November 16, 2012, the BIA dismissed Wu and Zhang's appeal.  The BIA agreed with the IJ that Wu had not met her burden of proof for asylum or her other requested relief.  As to asylum eligibility, the BIA expressly rejected Wu's assertion that the IJ used the wrong burden of proof and her argument that the IJ failed to consider Wu's evidence.  Specifically, the BIA determined that the IJ laid out the relevant law pertaining to asylum eligibility and that the IJ concluded, using the proper burden of proof, that Wu failed to establish a well-founded fear of

_____

[9]The IJ did not expressly rule on Zhang's claim of withholding of deportation.  By not addressing his claim for withholding of deportation before this Court, Zhang has abandoned this claim.  See Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1352 (11th Cir. 2009).

[10]Following the filing of Wu and Zhang's appeal, the BIA determined that there was no digital audio recording of the July 27, 2010 hearing and the IJ's oral decision.  Thus, the BIA returned the record to the IJ to prepare a complete transcript of the proceedings.  On November 16, 2012, following the receipt of the complete transcript of the July 27, 2010 proceedings, the BIA decided Wu and Zhang's appeal.

persecution.  The BIA determined that the IJ properly considered Wu's evidence, "given the [IJ]'s lengthy discussion of the evidence in [her] decision."  The BIA also specifically concluded that the IJ considered and evaluated the 2006 Tingjiang Document.  The BIA did not question any of the IJ's underlying factual findings.

The BIA determined that it reached the "same conclusion" as the IJ that Wu had not established a well-founded fear of persecution.  In reaching this conclusion, the BIA determined that Wu did not satisfy the three-pronged test set forth in In re J-H-S-.  The BIA described that test as requiring Wu to show: "(1) the births [of her children] violated family planning policies in [her] local province or municipality, (2) the family planning policies are being enforced, and (3) current local family planning enforcement efforts would give rise to a well-founded fear of persecution due to the violation."  Although using slightly different language, the substance of the test the BIA used in Wu's case is the same as used in In re J-H-S- and Matter of H-L-H-.[11]

The BIA determined that Wu failed to satisfy the test because: (1) much of her evidence did not address current family planning policies and was general in nature; and (2) she did not show that coercive family planning policies existed and were implemented in Fujian Province.  The BIA observed that much of Wu's evidence was cumulative of documents analyzed in prior BIA cases.  The BIA

---

[11]See supra note 8.

22

cited Matter of H-L-H-, the same case on which the IJ relied, as it had some of the same evidence in the record as this case.

The BIA determined that Wu's individualized evidence, when considered together with the documentation assessed in the BIA's past cases, did not demonstrate that forcible sterilizations were mandated in her home province after the birth of a third U.S.-citizen child. The BIA found that Wu's evidence established "no uniform policy regarding the implementation of the population control law with respect to children born outside of China."

As to the letters from Wu's relatives, the BIA observed that the witnesses were interested and not subject to cross-examination. The BIA specifically noted that, although Wu submitted evidence concerning Zhang's cousin Langying Liu, who was allegedly sterilized in 2009 after her second China-born child, Wu's evidence did not include the details of the underlying facts of this alleged sterilization, such that the BIA could determine that the procedure was in fact a form of persecution. In any event, Zhang's cousin Liu was not similarly-situated to Wu, as Liu did not have U.S.-born children. The BIA determined that the village or local family planning office documents were entitled to minimal weight because they were unauthenticated, not originals, and unsupported by independent evidence. In addition, the writers were not available for examination.

23

The BIA also observed that Wu's evidence did not establish penalties or sanctions rising to the level of persecution.  Having found Wu failed to satisfy the lower burden of proof for asylum, the BIA also found Wu failed to satisfy the higher standard for withholding of removal.[12]

On December 3, 2012, Wu and Zhang filed a petition for review in this Court.

## II.  DISCUSSION

### A.    Standard of Review

We review the BIA's factual findings to determine whether they are supported by substantial evidence.  Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc).  Under the substantial evidence standard, we "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision."  Id. at 1027. We may reverse the BIA's factual findings only "when the record compels a reversal."  Id.  "The mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings."  Kazemzadeh v. U.S. Att'y Gen., 577 F.3d

---

[12]Although both the IJ and the BIA concluded Wu and Zhang were not entitled to relief under the Convention Against Torture ("CAT"), Wu and Zhang never applied for CAT relief.  In any event, Wu and Zhang have abandoned any claim regarding their eligibility for CAT relief because, on appeal, they make only a one-sentence passing reference to this issue.  See Kazemzadeh, 577 F.3d at 1352 (providing that a petitioner abandons an issue where he makes only a passing reference to an issue in his brief).

24

1341, 1351 (11th Cir. 2009) (quotation marks omitted and alteration adopted).  We cannot reassess the evidence from scratch.  Adefemi, 386 F.3d at 1027.

We review the IJ's and the BIA's legal conclusions de novo.  Kazemzadeh, 577 F.3d at 1350.

"[W]e review only [the BIA's] decision, except to the extent the BIA expressly adopts the IJ's decision."  Wu v. U.S. Att'y Gen., 712 F.3d 486, 492 (11th Cir. 2013) (quotation marks omitted).  We have found that the BIA expressly adopted an IJ's decision where the BIA either agreed with the IJ's findings or relied on the IJ's reasoning, and in those circumstances, we have reviewed both the IJ's and the BIA's decisions to that extent.  See, e.g., Fajardo v. U.S. Att'y Gen., 659 F.3d 1303, 1307 n.3 (11th Cir. 2011) (concluding that, "[w]here, as is the case here, the BIA issues its own decision but relies in part on the IJ's reasoning, we review both decisions"); Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1275 (11th Cir. 2009) (reviewing both the IJ's and BIA's decisions to the extent that the BIA "affirmed and relied upon the IJ's decision and reasoning," but did not expressly adopt the IJ's opinion); Kazemzadeh, 577 F.3d at 1350 (providing that, because the BIA agreed with the finding of the IJ that Kazemzadeh failed to establish a well-founded fear of persecution on account of his religion, we review the decisions of both the IJ and the BIA about that issue); Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1344 (11th Cir. 2008) (concluding that because the BIA agreed with the

25

adverse credibility determination and the findings that the petitioner did not suffer past persecution, we review the decisions of both the IJ and the BIA regarding those findings).

Thus, we will review both the IJ's and BIA's decision to the extent that the BIA agreed with the IJ's findings or relied on his reasoning, even if the BIA did not use "magic words" and state that it was "adopting" the IJ's findings or reasoning.[13]  And, we review the BIA's decision "to those matters on which it rendered its own opinion and reasoning."  See Tang, 578 F.3d at 1275.

## B.    Authenticity of 2006 Tingjiang Document

On appeal, Wu and Zhang argue that the IJ and BIA erred in giving little or no weight to the 2006 Tingjiang Document.  Because the BIA adopted the IJ's finding that the 2006 Tingjiang Document was unauthenticated, we review both the BIA's and IJ's decisions with respect to that finding.

"Unauthenticated documents lack veracity and are entitled to no deference." Chen v. U.S. Att'y Gen., 672 F.3d 961, 964 (11th Cir. 2011); see Wu, 712 F.3d at 497 (stating that "'we cannot depend of [the] veracity' of unauthenticated documents" and determining that the IJ was within his discretion to discount a certificate showing that the petitioner had an abortion as lacking in probative

---

[13]Indeed, on appeal, Wu's brief primarily challenges the IJ's findings, reasoning, and legal conclusions.  Although the BIA did not say "adopt," Wu has never contended that the BIA did not rely on and adopt the IJ's findings and reasoning.  In other words, Wu wants us to examine both the IJ's and BIA's decisions.  The government also asks this Court to review both the IJ's and BIA's decisions.

value); Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1203, n.3 (11th Cir. 2005)

(observing that petitioner had "submitted official documentation from the Chinese

government indicating that she underwent a 'sterilization procedure,'" but

determining that this Court could not depend on the document's veracity because it

had not been authenticated).

One way to authenticate official records is to comply with 8 C.F.R. § 287.6.

This regulation, as relevant here, provides that "an official record . . . shall be

evidenced by an official publication thereof, or by a copy attested by an officer so

authorized."[14]  8 C.F.R. § 287.6(b).  Further, "[t]his attested copy in turn may but

need not be certified by any authorized foreign officer both as to the genuineness

of the signature of the attesting officer and as to his/her official position."  Id.

Here, Wu and Zhang did not produce either an "official publication" of the

2006 Tingjiang Document or a properly attested and certified copy of that

document.  Wu and Zhang do not even argue that they did.  Rather, they contend

that they authenticated the 2006 Tingjiang Document by other means.

This Court has not yet decided whether § 287.6 is the exclusive method of

authentication of documents filed in immigration proceedings.  See Ali v. U.S.

---

[14]What is required to authenticate an official record under § 287.6 is dependent upon whether the country in which the document originated is a signatory to the Convention Abolishing the Requirement of Legislation for Foreign Public Document.  8 C.F.R. § 287.6. China is not a signatory to this convention, and thus, the requirements concerning countries not signatories to the convention apply in this case.  Id. § 287.6(b).

27

Att'y Gen., 443 F.3d 804, 812 (11th Cir. 2006) (noting the petitioner's argument that § 287.6 was not the exclusive method for authentication of documents, but deciding that the petitioner had offered no compelling reason as to why he could not have obtained and submitted a properly certified document).[15]

Here, we need not decide whether § 287.6 is the exclusive method because the IJ did not explicitly treat § 287.6 as the exclusive means of authenticating the 2006 Tingjiang Document, but rather generally concluded that Wu and Zhang had not authenticated the document by any means. And, based on the record in this case, neither the IJ nor the BIA erred in the ultimate finding that Wu and Zhang did not authenticate the 2006 Tingjiang Document.

Wu and Zhang's main argument for authentication is: the DHS examined the document and concluded that there was no evidence that it had been altered. That the document had not been altered after its creation does not show that it was authentic at the time it was created. Wu and Zhang present no evidence that this document, produced with inkjet printing technology, was actually created by the

---

[15]As Wu and Zhang note, other circuits have held that § 287.6 is not the only way for an asylum applicant to authenticate a document. See Vatyan v. Mukasey, 508 F.3d 1179, 1184-85 (9th Cir. 2007) (determining that the IJ erred "insofar as he required [the petitioner] to produce some form of official certification as a mandatory pre-requisite to authenticating his proffered documents" and that a petitioner's testimony concerning a document may be sufficient to establish its authenticity); Liu v. Ashcroft, 372 F.3d 529, 532-33 (3d Cir. 2004) (providing that "asylum applicants can not always reasonably be expected to have an authenticated document from an alleged persecutor" and that the IJ erred by viewing the procedures set forth in § 287.6 as the exclusive means of authentication for foreign public documents (internal quotation marks omitted)).

28

Birth Control Office of Tingjiang Town.  Moreover, the evidence shows that documents from Fujian Province were often fraudulent.  In sum, the IJ and BIA properly considered this evidence and offered reasoned conclusions as to how to weigh it.  Wu and Zhang have not shown that the IJ and BIA erred in determining that the 2006 Tingjiang Document was unauthenticated. Thus, the IJ and BIA did not err in giving it little or no weight.

## C.    Asylum Eligibility

Wu and Zhang also argue that they established that Wu has a well-founded fear of future persecution if she returned to China, such that they were both entitled to asylum.

To establish asylum eligibility, an alien must show, with specific and credible evidence, either past persecution or a "well-founded fear" of future persecution on account of one of the statutorily listed factors, which include the alien's political opinion.  INA § 101(a)(42), 8 U.S.C. § 1101(a)(42); 8 C.F.R. § 208.13(a)-(b); Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230-31 (11th Cir. 2005).  Government-ordered forced sterilization or persecution for refusing to undergo such a procedure is "persecution on account of political opinion."  INA § 101(a)(42)(B); 8 U.S.C. § 1101(a)(42)(B).

Here, Wu seeks asylum based solely on her fear of future persecution.[16]  To establish a well-founded fear, "an applicant must demonstrate that . . . her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar v. Ashcroft, 257 F.3d 1262, 1289 (11th Cir. 2001).  To establish a well-founded fear of future persecution, the applicant "need only show that there is a reasonable possibility of suffering such persecution if . . . she were to return to [her home country]." Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007) (quotation marks and brackets omitted).  The asylum applicant bears the burden of proof.  Al Najjar, 257 F.3d at 1284.

1.     Forcible Sterilization

The BIA has determined that asylum claims by Chinese nationals who fear future sterilization based on China's one-child policy must be evaluated on a case-by-case basis.  In re J-H-S-, 24 I. & N. Dec. at 200-01.  To demonstrate an objectively reasonable well-founded fear, an alien must show: (1) "proof of the details of the family planning policy relevant to [her]"; (2) "the alien violated the policy"; and (3) "the violation of the family planning policy would be punished in

_____

[16]Because Wu does not claim that she suffered past persecution in China, she has no presumption of a fear of future persecution.  See Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007).

the local area in a way that would give rise to an objective fear of future persecution." Id. at 198-99.[17]

Here, after record review, we conclude that substantial evidence supports the BIA's conclusion that Wu failed to show a well-founded fear of persecution. First, Wu failed to satisfy the three-pronged test set forth in In re J-H-S-. Wu did not show the existence of a policy that counted U.S.-born children towards the number of children allowed under China's family planning policy. The record evidence shows that, in Fujian Province, U.S.-born children are not counted towards the number of children allowed under China's family planning policy where the U.S.-born children are not registered as permanent residents in China. Wu does not plan to register her children and even claims she cannot do so.

Second, even if Wu had shown the existence of a policy providing that U.S.-born children counted towards China's family planning policy, she has not shown that violations of the policy by parents with U.S.-born children would result in forcible sterilization of one of the parents. Wu submitted no evidence showing that a Chinese citizen returning to Fujian Province, China with U.S.-born children actually had been forcibly sterilized or penalized in a way amounting to persecution.

---

[17]Wu does not argue that the BIA's three-part test is an unreasonable interpretation of the term "well-founded fear" in INA § 101(a)(42), 8 U.S.C. § 1101(a)(42), to which we should not apply deference under Chevron v. U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984). See supra note 8.

In addition, the 2007 Profile states that: (1) China's national policy prohibits the use of physical force to compel a person to submit to sterilization; (2) even though local enforcement of family planning policies is uneven, U.S. Consulate General officials visiting Fujian Province and interviewing visa applicants from Fujian Province found evidence of coercion through public pressure and fines, but not the use of physical force; and (3) there were some reports in 2006 of forced sterilization in Fujian Province, but these were rare incidents by local officials without authority and using illegal means.

The record also contains October 2006 correspondence from the Fujian Committee to the U.S. Consulate General advising that: (1) children born abroad are not considered permanent residents of China and, thus, would not be counted under the one-child policy if the children are not entered in the household registry; (2) under Fujian Province regulations, there are no forced sterilizations; and (3) because Villagers' Committees do not have the authority to "make decisions on family planning disposition[s]," any "certificate/proof issued by said Committee should be deemed ineffective."  In follow-up correspondence dated January 2007, the Fujian Committee clarified that a child born overseas, but who has not established permanent residency in China (by being entered in the household registry), would not be counted even if the child was "administered as a Chinese citizen."

Wu's particularized evidence does not compel a contrary conclusion. First, although Wu argues that the 2006 and 2009 Tingjiang documents show that she violated the local family planning policy, the BIA was entitled to give those documents minimal weight, as they were not authenticated. See Chen, 672 F.3d at 964. Next, Wu argues that her relatives' letters and her aunt's statement concerning their sterilizations show that China's family planning policy was being enforced. However, the BIA observed these relatives were not similarly-situated to Wu, as they did not have U.S.-born children. Substantial evidence in the record in Wu's case provided a basis for the BIA to distinguish between U.S.-born and Chinese-born children for the purposes of enforcing China's family planning policy. To the extent that Wu's evidence conflicts with other evidence, we do not reweigh the evidence.

2.    Economic Persecution

Although Wu's forced sterilization claim fails, we must also consider her economic persecution claims. Fines may amount to persecution if they cause a "severe economic disadvantage," considering the alien's net worth, other sources of income, and the conditions of the local economy. See In re T-Z-, 24 I. & N. Dec. 163, 173-74 (BIA 2007) (internal quotation marks omitted). To satisfy the severe economic disadvantage standard, the fine should reduce the alien "to an impoverished existence." Id. at 174. Substantial evidence also supports the

33

finding that Wu did not show an objectively reasonable fear of economic persecution.

As noted above, it appears that Wu's three children born in the United States would not be counted towards China's family planning policy so long as Wu and Zhang do not try to establish their children's legal permanent residence in China. On appeal, Wu actually claims that she would not be able to register her children in the family's household. Thus, it is unlikely that Wu would even be subjected to fines at all under China's family planning policy.

We recognize that, if Wu's children are not registered in the household registry, her children would be ineligible for free medical care and public education. But, on this record, Wu has not shown that having to pay for those benefits rises to the level of persecution.

And, even assuming that Wu would be fined, Wu testified her family's income would be about 500 RMB a month or 6,000 RMB a year, and based on the record evidence, the one-time fine would likely be 60 to 100 percent of her family's annual income.[18] The record reflects that, if Wu and Zhang could not pay the fine at once, they may be allowed to pay it in installments and their wages could not be garnished. Further, evidence in the record provides that a fine could

---

[18]Although Wu testified that, in 2009, Zhang's cousin was fined 60,000 RMB, Wu did not specify Zhang's cousin's income, and thus, the record provides no basis for a conclusion that Wu would be fined as much as Zhang's cousin.

be reduced or waived for "poor persons." Accordingly, on this record, we are not compelled to conclude that any fine will be imposed on Wu or that any potential fine would reduce Wu to an impoverished existence. We thus cannot say that this record compels a conclusion that there is a reasonable possibility that Wu would face economic persecution if she returned to China. See In re T-Z-, 24 I. & N. Dec. at 173-74.[19]

### 3.    Li v. U.S. Att'y Gen. and Related Cases

Finally, we recognize that Wu's brief cites Li v. U.S. Att'y Gen., 488 F.3d 1371 (11th Cir. 2007), but that case is materially different from Wu's. Li involved a motion to reopen and whether the petitioner alleged a prima facie case of asylum. In Li, the BIA based its decision on a distinction between Chinese-born and foreign-born children. Id. at 1376. Reversing the BIA, this Court concluded that the BIA had "invoked this distinction despite the absence of any evidence in the record . . . that either the Chinese national government or local Fujian officials distinguish between parents of children born abroad and parents of children born in China." Id. (emphasis added). In Li, this Court found that "the only evidence in

---

[19]An applicant for withholding of removal must show it is more likely than not that she will be persecuted based on a protected ground. Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003); 8 C.F.R. § 208.16(b). Because this standard for establishing eligibility for withholding of removal is higher than the standard for establishing asylum eligibility, an applicant who, like Wu, fails to meet the burden of proof for asylum necessarily fails to establish entitlement to withholding of removal. See D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004).

t[he] record supports the <u>opposite conclusion</u>" and showed that "for some purposes at least, the Chinese government considers foreign-born children of Chinese nationals equivalent to children born in China." <u>Id.</u> (emphasis added). This Court then held that, in "light of this record," the BIA erred in relying on a distinction between foreign-born and Chinese-born children to determine that Li failed to establish a prima facie case for asylum in resolving Li's motion to reopen. <u>Id.</u>

In stark contrast to <u>Li</u>, Wu's case involved a final merits determination with a large evidentiary record and an evidentiary hearing, followed by fact findings by the IJ and conclusions by the IJ and BIA. Importantly, the record in Wu's case contains considerable evidence that the Chinese government distinguishes between foreign-born and Chinese-born children in applying its family planning law.

Although Wu does not cite these cases, our Court has reached conclusions similar to <u>Li</u> in two other motion to reopen cases: <u>Jiang v. U.S. Att'y Gen.</u>, 568 F.3d 1252 (11th Cir. 2009) (lack of evidence) and <u>Zhang v. U.S. Att'y Gen.</u>, 572 F.3d 1316 (11th Cir. 2009) (failure to consider evidence). In both cases, the BIA had denied the motions to reopen.

Reversing the BIA in <u>Jiang</u> for lack of evidence of a distinction between Chinese-born and U.S-born children, this Court found "no discernable difference between the evidence presented in <u>Li</u> and the evidential foundation before us today." <u>Jiang</u>, 568 F.3d at 1258. Reversing the BIA in <u>Zhang</u>, this Court

36

determined, inter alia, that, even if the BIA properly discounted a "Village Committee Letter" and Zhang's statement, the BIA's decision overlooked, or inexplicably discounted, the other record evidence that corroborated Zhang's claim.  Zhang, 572 F.3d at 1320.[20]  Due to the lack of evidence in Jiang and the failure to consider evidence in Zhang, we ordered reopening and remands to consider the evidence and the merits of the claims.

As the BIA has emphasized, asylum cases involving enforcement of China's family planning law require a case-by-case analysis.  See J-H-S-,  24 I. & N. Dec. at 197-98, 200-01, petition denied sub nom., Shao, 546 F.3d at 156-57 (according Chevron deference to the BIA's determination that claims based on an alien's alleged violation of China's family planning law are reviewed on a case-by-case basis).  Wu's record contains substantial evidence supporting the IJ's and BIA's findings and conclusions, and the IJ and BIA properly considered that evidence.

For all of the foregoing reasons, we deny Wu and Zhang's petition.

**PETITION DENIED.**

---

[20]The Zhang court focused on a December 27, 2005 Directive from "the Lianjiang County Guantou Township Committee" and the BIA's failure to address "the Department of State Reports on China and other record evidence."  Zhang, 572 F.3d at 1318, 1320.

37