[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10131
Non-Argument Calendar
_____

Agency No. A205-361-369

OLGA GENNADYEVNA GILYAZETDINOVA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(June 25, 2019)

Before MARCUS, JORDAN and ROSENBAUM, Circuit Judges.

PER CURIAM:

Olga Gilyazetdinova, a native of the Soviet Union and a citizen of Russia,
appeals the Board of Immigration Appeal's ("BIA") final order dismissing her
appeal from the Immigration Judge's ("IJ") denial of her application for asylum,

withholding of removal, and relief under Convention Against Torture ("CAT").  She only appeals the BIA's denial of withholding of removal, abandoning any challenge to the denial of asylum and CAT relief.  On appeal, she says that substantial evidence does not support the IJ's adverse credibility determination or the agency's denial of withholding of removal because she showed a nexus between her persecution and Bashkir ethnicity, and because the country condition reports reveal that societal violence and discrimination was increasing in Russia, especially in the place of suggested relocation, Bashkortostan.  After careful review, we deny the petition.

Where the BIA either agreed with the IJ's findings or relied on the IJ's reasoning, we review both the BIA and IJ decisions to the extent of the agreement. Mu Ying Wu v. U.S. Att'y Gen., 745 F.3d 1140, 1153 (11th Cir. 2014).  We review the IJ's findings of fact under the substantial evidence test, and will affirm the IJ's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005).  Under the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of it.  Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1255 (11th Cir. 2006).  Thus, a finding of fact will only be reversed when the record compels it.  Id. The mere fact that the record may support a different conclusion is insufficient to

2

justify a reversal of the agency's findings.  Id.  We do not consider issues not reached by the BIA.  Gonzalez v. U.S. Att'y Gen., 820 F.3d 399, 403 (11th Cir. 2016).

To qualify for withholding of removal under the Immigration and Nationality Act ("INA"), an alien must show that her life or freedom would be threatened, in the country to which she would be removed, on account of her race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. § 1231(b)(3).  The burden is on the alien to show eligibility for relief.  See 8 C.F.R. § 208.16(b); Sepulveda, 401 F.3d at 1232.

A petitioner may satisfy her burden in one of two ways.  8 C.F.R. § 208.16(b).  First, she may establish past persecution based on a protected ground, which creates a rebuttable presumption that her life or freedom would be threatened if removed to her country.  Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004).  If she does not show past persecution, she may still be entitled to withholding of removal if she establishes that it is more likely than not that she would be persecuted upon removal on account of a protected ground.  Id.  She must demonstrate that her well-founded fear of future persecution is both subjectively and objectively reasonable.  Ruiz, 440 F.3d at 1257.  She can prove the subjective component by her credible testimony that she genuinely fears persecution, and the objective component by either establishing past persecution or a good reason to fear future persecution.  Id.

3

Under either method of satisfying her burden, she must establish a nexus between the past or future persecution and one of the five protected grounds, or in other words, show that the persecution was motivated, at least in part, by a protected ground. See 8 C.F.R. § 208.16(b); Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006). To establish a likelihood of future persecution, the alien must show either that she will be singled out for persecution or that the country has a pattern or practice of persecuting those who are of an ethnicity with which she identifies. See 8 C.F.R. § 208.16(b)(2). The statute governing withholding of removal protects not only against governmental forces but also against non-governmental groups that the government cannot control. Ruiz, 440 F.3d at 1257. Evidence that is consistent with acts of private violence or that a person has been the victim of criminal activity does not constitute evidence of persecution on account of a protected ground. Id. at 1258.

An alien does not have a well-founded fear of future persecution if she could avoid persecution by relocating to another part of her country of nationality, if under all the circumstances it would be reasonable to expect her to do so. See 8 C.F.R. § 208.16(b)(2). To decide whether relocation is reasonable, we look to several factors, including whether the alien would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country, administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Id. § 208.16(b)(3). Where

4

an alien fails to establish past persecution, she bears the burden of showing that it would be unreasonable for her to relocate.  Id. § 208.16(b)(3)(i).

Here, the only two issues on appeal are whether substantial evidence supports the IJ's and BIA's findings that Gilyazetdinova did not: (1) demonstrate a nexus between her alleged persecution and ethnicity, and (2) have a well-founded fear of future persecution because she could relocate and there was no pattern or practice of persecution of Bashkirs.  Because the BIA agreed with the IJ on those issues, and offered additional conclusions, we review both decisions.  See Mu Ying Wu, 745 F.3d at 1153.[1]

First, even taking Gilyazetdinova's testimony as credible, substantial evidence supports the IJ's and BIA's finding that there was no nexus between her alleged persecution and her Bashkir ethnicity.  Her birth certificate showed that she was Russian, and while she testified that her father was listed as Russian out of his parents' fear of listing him as Bashkir, she admitted she is mostly Russian and only one-fourth Bashkir.  Further, she was born in Russia, is not Muslim, does not speak the Bashkir language, and has never been to Bashkortostan.  She also conceded that when she was harassed with her Korean friend in St. Petersburg, the skinheads' derogatory comments were directed at her friend's appearance and not hers.

---

[1] As an initial matter, we need not address Gilyazetdinova's challenge to the IJ's adverse credibility determination because the BIA did not reach the merits of it and, in any event, resolved it in her favor.  We will similarly assume that she is credible.

The only evidence that Gilyazetdinova was persecuted on account of her Bashkir ethnicity was her subjective belief that her physical appearance points to her Bashkir ethnicity and her testimony that a classmate, Kirill Shalobaev, had attacked her. But while she said that Kirill taunted her for being Bashkir, his attacks occurred when they were in elementary school, which undermines her argument that she still faces mistreatment on account of her ethnicity. As for later attacks in Kaliningrad and Moscow, they occurred in adulthood and were accompanied by ethnic slurs and derogatory comments, but were made based on the perception that she was a foreigner or a Muslim, not on the perception that she was Bashkir. She is neither a foreigner, nor Muslim. With respect to the Moscow attack, she did not explain how her attacker knew that she was Bashkir; in fact, the police, who came to her aid shortly after the attack, initially did not know. Further, she did not provide evidence that her parents, or any other Bashkirian, suffered harm on account of their ethnicity or last name, apart from her testimony that she believed that her father was attacked by nationalists. The record, therefore, does not compel the conclusion that she was specifically targeted in adulthood for her Bashkir ethnicity.

Substantial evidence in the record also supports the determination that Gilyazetdinova did not have a well-founded fear of future persecution. Because she is presumed credible, she showed that her fear was subjectively reasonable. See Ruiz, 440 F.3d at 1257. Nevertheless, she has failed to show that her fear was

6

objectively reasonable.  See id.  The country condition reports showed that skinhead and other hate groups target ethnic minorities, particularly those from Central Asia and those with darker skin, Muslims, and any group perceived as non-Russian, but they do not mention the Bashkir ethnicity at all, other than to say that the Bashkirs comprise 1.1 percent of the Russian population.  The materials also described rising societal violence toward ethnic minorities, including members of internal youth groups, natives of Central Asian states, natives of the Caucasus region, people identified as "non-Slavic," and blacks; in 2012, for instance, there were 18 deaths and at least 171 injured as a result of attacks against all ethnic minorities in 30 regions in Russia.  We cannot deny that these figures are upsetting, but the evidence does not detail the number of victims of the Bashkir ethnicity, nor, moreover, does it compel the conclusion that systematic and extreme persecution exists.  See Sepulveda, 401 F.3d at 1231 (explaining that persecution is an extreme concept requiring more than a few isolated incidents of verbal harassment or intimidation).

In any event, substantial evidence shows that relocation is reasonable because Gilyazetdinova would not face serious harm in Bashkortostan -- the suggested place of relocation.  See 8.C.F.R. § 208.16(b)(3).  The 2011 Country Report did not indicate that Bashkortostan had a high level of violence, and when the 2012 Country Report did, it listed 19 attacks against ethnic minorities in Bashkortostan in 2012.  Based on the infrequency of those attacks, the record does not compel the conclusion

that Gilyazetdinova has a well-founded fear of future harm in Bashkortostan.  In addition, she has the option to move back to Moscow.  Although the reports indicate that Moscow has one of the highest incidents of violence, the record shows that the police are beginning to take skinhead violence more seriously and prosecute hate crimes.  Substantial evidence also supports the conclusion that Gilyazetdinova is not geographically limited in Russia.  See 8 C.F.R. § 208.16(b)(3).  While she testified that the "propiska system" -- the domicile registration requirements -- made moving in Russia difficult, she was able to move from St. Petersburg to Moscow for a job without difficulty, because of her mother's connections in the city.  On this record, the evidence does not compel the conclusion that Gilyazetdinova is without the means and resources to move again within Russia.

**PETITION DENIED.**

8