[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13895
Non-Argument Calendar
_____

Agency No. A201-255-600


YAUHENIYA VALERYEVNA TRASHCHOTKINA,
ALEXANDER LISITSYN,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(November 20, 2014)

Before ED CARNES, Chief Judge, HULL and MARTIN, Circuit Judges.

PER CURIAM:

Yauheniya Trashchotkina, a citizen of Belarus, seeks review of the Board of Immigration Appeals' (BIA) decision that affirmed the Immigration Judge's (IJ) order to have her removed from the United States.[1] Trashchotkina conceded her removability but pursued relief from removal through either asylum or withholding of removal.[2] The IJ and the BIA denied relief on both grounds.

## I.

To obtain asylum, Trashchotkina needed to demonstrate that she is a "refugee." See 8 U.S.C. § 1158(b)(1)(A). She is only a refugee if she "is unable or unwilling to return to [her home country] . . . because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." See id. § 1101(a)(42)(A). Trashchotkina claimed that she is a refugee based on the oppression she experienced as a political dissident in Belarus. Finding her testimony implausible

---

[1] Trashchotkina's husband, Alexander Lisitsyn, is a rider on her application. See 8 U.S.C. § 1158(b)(3)(A). He brings no claims of his own, and whether we grant him relief depends entirely upon our disposition of Trashchotkina's petition.

[2] Trashchotkina also sought relief under the Convention Against Torture (CAT). See 8 C.F.R. §§ 208.16(c), 1208.16(c). The IJ denied that request. The BIA held that because she "did not meaningfully challenge the Immigration Judge's denial of CAT protection, the issue is waived on appeal." She does not now challenge either of those conclusions, so we do not consider her claim under the CAT. See Dormescar v. U.S. Att'y Gen., 690 F.3d 1258, 1269 n.11 (11th Cir. 2012) ("Because Dormescar did not raise that issue before the IJ or the Board, we cannot and do not consider it here. Nor did he raise the issue before this Court, which is another reason we do not consider it.") (citation omitted).

and insufficiently corroborated, the IJ concluded that she is not a refugee.  On appeal, the BIA agreed with that conclusion.

"We review the decision of the Board, and we review the decision of the Immigration Judge to the extent that the Board expressly adopted the opinion of the Immigration Judge."[3]  See Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1350 (11th Cir. 2009) (quotation marks omitted).  When considering the IJ's and the BIA's decisions, we review their legal conclusions de novo and their factfindings only for substantial evidence.  Id.

The substantial evidence standard is highly deferential.  It makes the IJ and BIA's findings "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).  It binds us to decide "only 'whether there is substantial evidence for the findings made by the BIA, not whether there is substantial evidence for some other finding that could have been, but was not, made.'"  Adefemi v. Ashcroft, 386 F.3d 1022, 1029 (11th Cir. 2004) (en banc).  And throughout this inquiry, we must view the record in the light most favorable to those findings, drawing all reasonable inferences in their favor. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005).

---

[3] In this case, the BIA adopted some, but not all, of the IJ's findings and reasoning.  It also made its own findings and expanded on parts of the IJ's reasoning.

This all means that we may not reverse just because we decide the record could support a contrary decision.  We may reverse only if the record leaves us with no reasonable choice but to disagree with the IJ and the BIA's findings.  See Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1345 (11th Cir. 2008) ("We may reverse a finding of fact only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings.") (quotation marks omitted).

## II.

As a general rule, asylum-seekers do not need to present any proof of "persecution or a well-founded fear of persecution" other than their own credible testimony.  See Lin Lin Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1276 (11th Cir. 2009) ("If an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy her burden of proof in establishing her eligibility for relief from removal.").  If Trashchotkina's testimony was "credible," "persuasive," and referred to "specific facts," the IJ could have granted her asylum without considering any other evidence.  See 8 U.S.C. § 1158(b)(1)(B)(ii).  But the IJ did not find Trashchotkina's testimony credible, persuasive, and specific.  The IJ discounted parts of her testimony as implausible, and the BIA agreed.  Trashchotkina contends that they improperly discounted her testimony.

4

A.

The IJ found that Trashchotkina's testimony describing her experience as a Belarusian dissident was implausible from the beginning. She testified that she began studying jurisprudence at Belarus State University (BSU) in the fall of 2006 on an academic scholarship. She lived off campus her first year, but because of her high grades, BSU awarded her a place on campus in student housing for her second year. The IJ found these details in tension with the State Department's report on Belarus. See Imelda v. U.S. Att'y Gen., 611 F.3d 724, 728 (11th Cir. 2010) ("We have held that the BIA may rely heavily on State Department reports about a country.").

According to that report, "[h]igh school students feared that they would not be allowed to enroll in universities without joining" the Belarusian Republican Youth Union, a group that supports Alexander Lukashenko, the Russocentric president of Belarus since 1994. University students reported that Youth Union membership "was often needed to register for popular courses or to receive a dormitory room." The education minister made membership a prerequisite for professional training in foreign affairs, state administration, or journalism. Trashchotkina never testified that she joined the Youth Union, nor even that she ever showed any outward support at all for Lukashenko. She nonetheless was admitted to BSU, allowed to study law, and awarded both a scholarship and a spot

5

on campus in student housing. The IJ found this implausible in light of the evidence that admission to BSU — not to mention a scholarship and on-campus housing — was tied to support for Lukashenko.

The IJ found Trashchotkina's account of her second year at BSU even more implausible. She testified that, during that fall, her lack of outward support for the political establishment turned into vocal opposition. In November 2007 she joined the Belarusian Popular Front (BPF), a nationalistic political party opposed to President Lukashenko. The record establishes that Lukashenko's treatment of BPF is occasionally violent. Trashchotkina testified that she attended her first BPF rally in January 2008 and that she was one of about a dozen protestors who were arrested. The police threatened and interrogated her, and then let her go after recording the information on her student ID card. When testifying, Trashchotkina mentioned no consequences that she suffered. She retained her enrollment in BSU, her scholarship, and her place in on-campus housing. BSU's administration did not even warn her about her political activities. The IJ found it implausible that, in light of the university's refusal to admit applicants who did not support Lukashenko, BSU would turn a blind eye to a student's arrest at an opposition rally.

In addition to agreeing with the IJ's findings, the BIA also found that the government's indifference to Trashchotkina's political activities raised doubts

6

about her story.  That first arrest meant the Lukashenko regime knew Trashchotkina was a dissident as early as January 2008.  In spite of that, it awarded her a visa to travel to the United States as an exchange student during the summer of 2008.  The BIA found it improbable that the Lukashenko regime, a concededly oppressive one, would allow a known opposition member to travel outside the country, in particular to the United States.

The IJ found similar details in Trashchotkina's account of her third year at BSU to be implausible.  She testified that she attended another BPF rally, on Valentine's Day 2009, which resulted in a melee with the riot police.  She stated that a policeman pulled her from the crowd, took her student ID, pushed her to the ground, kicked her in the stomach, and left.  She claimed to have suffered a concussion from the attack and that soon afterwards, BSU's dean called Trashchotkina into his office.  She said he told her that the police had brought her student ID to him and that he had informed the faculty of her involvement with BPF.  Although he urged Trashchotkina to join the pro-Lukashenko Youth Union, he did not threaten any particular action.  After her third year, the Lukashenko government again awarded Trashchotkina a visa to travel to the United States, despite her allegations about two arrests at BPF rallies and the BSU's growing interest in her.  The IJ and the BIA found it improbable that the Belarusian authorities would continue to ignore Trashchotkina's political activities.

7

The IJ also found Trashchotkina's account of BSU's punishments of her, which she testified had finally begun during her fourth year there, to be implausible. BSU did not punish her until the fall of 2009, over a year-and-a-half after she was first arrested. The school branded her an "oppositional activist" and kicked her out of her dorm room. After that, BSU and the police ignored her participation at a rally in December 2009, but then, on her way to a rally in March 2010, she was arrested. She claimed that the police interrogated, threatened, and beat her, and then they returned her possessions, including her BPF ID card, and let her go. The IJ found it particularly implausible that the police would return her ID card.

Trashchotkina testified to a rapid crescendo of harassment targeted specifically at her in the late spring of 2010. In May a group of men assaulted her outside her apartment, dislocating her elbow and threatening to do worse if she continued supporting BPF. On June 1 BSU did not allow Trashchotkina to sit for exams. When she complained, the dean told her that her case had been sent to the rector, who was considering expelling her because of her political activities. On June 8 four policemen showed up at her apartment with a warrant. They searched the apartment and confiscated anything BPF-related that they could find. They then arrested and interrogated Trashchotkina again. Her interrogator told her she had slandered President Lukashenko, a crime for which she could spend years in

8

prison, and then forced her to sign a transcript of the interrogation, telling her to expect a court summons.

According to Trashchotkina's testimony, as of June 2010, she was not only a known BPF member but also had been told by law enforcement to expect a summons to appear in court. BSU's dean had told her that her expulsion was under consideration. And yet, despite these ongoing investigations, the Lukashenko regime awarded Trashchotkina a third visa to travel to the United States as an exchange student. The BIA found it hard to believe that if she were telling the truth any oppressive government — much less one as oppressive as the Belarusian government — would let Trashchotkina leave the country, given the high risk that she would never return. She did not, in fact, return. She left Belarus bound for New York on June 16, 2010, and has not returned since. She never heard whether the government brought criminal charges against her, and only after leaving Belarus did she hear that BSU had finally decided to expel her.

The IJ also found Trashchotkina's narrative about her time in the United States to be implausible. She testified that she began participating in the Belarusian American Alliance while living in New York, but she never officially joined that group. And when she moved to Florida, her participation in the group stopped entirely. The IJ found that Trashchotkina, whose parents and friends still live in Belarus, had hardly participated at all in the efforts of Belarusian expatriates

9

in this country to cause political change in their home country. The IJ found it implausible that Trashchotkina's political convictions could be so strong while she lived in Belarus that she risked her life and her studies for them, and yet so weak once she set foot in the United States.

B.

The IJ and the BIA's implausibility finding is a factual one. We therefore review it only for substantial evidence. Trashchotkina must show not merely that a reasonable factfinder could have found her testimony plausible, but that the record would compel a reasonable factfinder to reverse the IJ and the BIA's finding. See 8 U.S.C. § 1252(b)(4)(B); Forgue, 401 F.3d at 1286 (holding that credibility determinations are reviewed only for substantial evidence).

Trashchotkina first asserts that the report of Dr. Ralph Clem, her expert on Belarus, explains any implausibility in her testimony. His report explains that the Lukashenko regime takes a "gradualist approach" to dissident students, meaning that it tries to persuade the students to stop dissenting and turns to coercion only if that persuasion fails. Clem's report provides only a partial explanation for BSU's treatment of Trashchotkina. It could explain why BSU did not expel her as its first response to her political activities, but it does not explain why, without joining the Youth Union or showing some support for Lukashenko, she was admitted to BSU, given a scholarship, and awarded a room on campus in the first place. Nor does it

10

explain why, after Trashchotkina's first arrest, BSU waited over a year to even acknowledge her affiliation with BPF and about a year-and-a-half to punish her. Clem's report, by itself, does not compel us to reverse the IJ and the BIA's implausibility finding.

Trashchotkina asserts one other explanation that builds on Clem's report. She points out that BSU awarded her progressively higher honors — admission, scholarship, and housing — before she joined BPF and stripped them away piecemeal as it learned about her political activities. In other words, as soon as BSU discovered her membership in BPF, it began levying gradually more severe punishments against her. The timeline in Trashchotkina's testimony does not support this reading of BSU's actions. The police recorded the information on her student ID card the first time they arrested her in January 2008, but according to her BSU did not even acknowledge that first arrest and did not begin to punish her until about a year-and-a-half later. Her account is implausible in that respect. Other evidence, such as the State Department report, shows the Belarusian authorities' intolerance of dissent and indicates that, even if they do punish young dissidents gradually, they begin to do so much more quickly than they did in Trashchotkina's narrative. Finally, much like Clem's report, this second explanation only partially responds to the IJ and BIA's concerns. It does not explain how, in a country where the government doles out political favors using

11

the universities, Trashchotkina received all the benefits from BSU that she did when, she claims, she never showed any support for the Lukashenko regime.

Even if we could find Trashchotkina's testimony plausible were we the factfinder in this case, we are not. Her explanations must convince us that the record would compel — not permit but compel — a reasonable factfinder to find her testimony plausible. They do not.

Trashchotkina has failed entirely to explain some of the IJ and the BIA's concerns. For example, the BIA found it unlikely that the Lukashenko regime would issue three travel visas to Trashchotkina if her story were true. The "gradualist approach" to dissidents cannot explain why the oppressive Belarusian government would repeatedly issue a visa to her, a known dissident, permitting her to travel to the United States of all places. Neither does she attempt to explain the Belarusian authorities' burst of punitive energy in the spring of 2010. Up to that point, they had all but ignored her multiple arrests at BPF rallies. Their earlier response — slow-footed and faltering as it was — renders implausible their sudden interest in her. Nor does she explain why the police, each time after arresting her for BPF activities, returned her BPF ID card to her. Finally, she points to no evidence of her involvement in the Belarusian expatriate political community beyond that which the IJ found insufficient. Her explanations do not compel us to find that her testimony was plausible.

III.

Because parts of Trashchotkina's testimony are implausible, the IJ and the BIA looked to the record for corroborating evidence. See 8 U.S.C. § 1158(b)(1)(B)(ii) (allowing the IJ to require the introduction of corroborating evidence); Feng Chai Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) ("The weaker an applicant's testimony, however, the greater the need for corroborative evidence."). Finding a lack of corroborating evidence, the IJ and the BIA denied Trashchotkina's claim. She argues that, assuming her testimony is implausible, she presented enough corroborating evidence to meet her asylum burden.

A.

When an IJ requires corroborating evidence, even for "otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added). The IJ and the BIA found that Trashchotkina had failed to present enough evidence to corroborate her implausible testimony. We may reverse that factual determination only if the record compels reversal. See id. § 1252(b)(4)(B); Forgue, 401 F.3d at 1286.

Trashchotkina first points to medical records from Belarusian and American doctors as corroboration. The Belarusian records show that she was treated for

13

injuries like those her testimony described and on dates close to those in her testimony, but the records show nothing about the cause of those injuries. The American records fail for similar reasons. They prove that an American doctor, years after the fact, said that a scar on Trashchotkina's forehead could have come from being pushed to the ground by a policeman. The medical records do not connect her injuries to any political activities in Belarus nor to any oppression by the Lukashenko regime. Viewed in the light most favorable to the BIA's decision, they do not compel us to find that Trashchotkina presented enough corroborating evidence.

Trashchotkina points next to two documents from other BPF members. The IJ failed to acknowledge either of these documents, which was error. See Lin Lin Tang, 578 F.3d at 1280 ("We do not expect a judge to selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach.") (quotation marks omitted). But this error does not require us to reverse. Viewed in the light most favorable to the agency decision, see Forgue, 401 F.3d at 1286, the documents do not compel us to hold that Trashchotkina presented enough corroborating evidence.

The first document, which is a letter from the "Chairperson of the BPF," on BPF letterhead, and with a BPF seal, states that Trashchotkina attended BPF meetings and rallies, in particular those rallies mentioned in her testimony. It also

14

states, without providing any details, that Trashchotkina "was apprehended multiple times" and "faced humiliating treatment [and] physical abuse" from the police.  The second document, written by Valeria Levanenka, bears a notary's seal on its final page.  It mentions a number of details from Trashchotkina's testimony, although it admits that Levanenka knew about many of the details only because Trashchotkina had told them to her.

As an initial matter, neither document can compel reversal of the IJ and the BIA's decision because neither is authenticated.  See Xiu Ying Wu v. U.S. Att'y Gen., 712 F.3d 486, 497 (11th Cir. 2013) ("'[W]e cannot depend of [the] veracity' of unauthenticated documents . . . .") (citation omitted) (second alteration in original); Feng Chai Yang, 418 F.3d at 1202 n.3 ("[T]his document has not been authenticated, and thus we cannot depend on its veracity.").  Trashchotkina presented no authentication evidence to the IJ and neither document is self-authenticating.  Cf. Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); Fed. R. Evid. 902 (listing the ways a document may be self-authenticating).[4]  Furthermore, Levanenka's statement admits that it does little

---

[4] We acknowledge that "it is a well-settled principle that the Federal Rules of Evidence do not apply in administrative proceedings."  See Garces v. U.S. Att'y Gen., 611 F.3d 1337, 1347 (11th Cir. 2010) (brackets omitted) (quotation marks omitted).  We cite the authentication rules

15

more than repeat a narrative that Trashchotkina told her. Viewed in the light most favorable to the agency's decision, a secondhand account of the contents of Trashchotkina's testimony cannot corroborate that testimony.

Even if we took these two documents at face value, which the standard of review does not allow, they establish only that Trashchotkina did participate in political rallies in Belarus and did suffer some consequences from the police as a result. Neither document mentions Trashchotkina's expulsion from BSU or an outstanding warrant for her arrest in Belarus, which leaves important parts of her testimony uncorroborated. This shortcoming shows that, although the IJ erred by failing to discuss these letters, our consideration of them does not compel us to conclude that Trashchotkina carried her corroboration burden.

Beyond that, even taken together with the medical records, the documents leave key parts of Trashchotkina's testimony uncorroborated. At best, the evidence corroborates her past arrests with nothing more than a vague statement in the BPF letter that she was apprehended multiple times. In particular, none of the evidence corroborates her June 2010 arrest, when the police allegedly told her to expect a court summons. She has presented no evidence that a summons ever issued or that criminal charges against her are pending. She similarly presented no

here only to illustrate the sort of authentication evidence that we had in mind in <u>Xiu Ying Wu</u> and <u>Feng Chai Yang</u>.

corroborating evidence of her expulsion from BSU. The IJ and the BIA found that she left too many parts of her testimony uncorroborated to warrant refugee status. She has not shown that the record compels us to disagree with the agency's decision.

B.

Nor has Trashchotkina proven that other evidence that could corroborate her testimony exists but was not reasonably obtainable. See 8 U.S.C. § 1158(b)(1)(B)(ii) ("Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.") (emphasis added). She argues that the BIA erred when it found evidence corroborating her testimony — namely, evidence of a summons issued against her and of her expulsion from BSU — to be reasonably obtainable. We review that finding for substantial evidence. See 8 U.S.C. § 1252(b)(4)(D) ("No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence" unless the court finds, "that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.").

Regarding the summons, she asserts that it would have issued after she moved out of her apartment and left for America, and she therefore had no way of

17

obtaining a copy of it.  But she testified that the police had come to her parents'

house looking for her on at least one previous occasion, which suggests they would

do so again if charges were pending against her.  If so, she could at least get a

statement from her parents regarding the summons, if not a copy of the summons

itself.  But the only statement from her parents that she has put in the record, a

letter from her mother, does not mention a summons or any visit by the police

seeking to arrest Trashchotkina.  According to her, the letter's failure to mention

those details suggests that evidence of a summons was not reasonably obtainable.

It just as likely, if not more likely, suggests that no criminal charges are pending

against Trashchotkina.  Far from corroborating her testimony, her mother's letter

undercuts the assertion that politically motivated charges are pending, which is a

key part of Trashchotkina's asylum claim.

Trashchotkina also contends that no corroborating evidence of her expulsion

from BSU was reasonably obtainable, because any documents about it would have

arrived at her apartment in Belarus after she left for the United States.  She testified

that she found out about the expulsion only because some friends told her mother,

who told her.  She cannot now acquire a copy of any documents from BSU, she

asserts, because those same friends are too afraid to ask for them.[5]  She does not

---

[5] She goes on to assert that there was no basis for believing that documentary evidence of her expulsion even existed.  While we certainly do not permit conclusions based on "conjecture or speculation," see Xiu Ying Wu, 712 F.3d at 494 (quotation marks omitted), a factfinder does not

18

explain from what source those friends heard about her expulsion in the first place, nor why they cannot now go to that same, presumably trusted, source for evidence of it. She points to no evidence in the record at all to corroborate her expulsion. Not even her mother's letter mentions it, and she claims her mother heard about her expulsion. The problems with Trashchotkina's explanations mean that the record does not compel us to hold that evidence corroborating the court summons or her expulsion was not reasonably obtainable.

## IV.

Finding that key parts of Trashchotkina's testimony were implausible and that she failed to produce enough corroborating evidence to compensate for those implausibilities, the IJ and the BIA denied her asylum claim. Because the record does not compel us to conclude otherwise we must affirm that decision. Trashchotkina's ineligibility for asylum means that she is also ineligible for withholding of removal. See Rivera v. U.S. Att'y Gen., 487 F.3d 815, 820–21 (11th Cir. 2007) (holding that an alien who has failed the "well-founded fear" test for asylum will necessarily fail the more stringent "more likely than not" test for withholding of removal).

---

speculate by presuming that a student's expulsion from a university would be documented in some way.

19

Having no other challenges to the BIA's judgment before us, we deny

Trashchotkina's — and as a result Lisitsyn's — petition for review.

**PETITION DENIED.**