[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-11502
Non-Argument Calendar

_____

Agency No. A089-098-882

XIU YING WU,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 12, 2013)

Before TJOFLAT, WILSON and KRAVITCH, Circuit Judges.

WILSON, Circuit Judge:

Xiu Ying Wu, a native and citizen of China, petitions for review of the Board of Immigration Appeals's (BIA) final order affirming the Immigration Judge's (IJ) denial of her application for asylum under the Immigration and Nationality Act (INA) § 208(a), 8 U.S.C. § 1158(a), withholding of removal, INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), 8 C.F.R. § 208.16(c).  On appeal, Wu argues that the IJ's adverse-credibility determination is not supported by substantial evidence and that she is eligible for asylum, withholding of removal, and CAT relief.  After careful review, we dismiss the petition in part and grant the petition in part.

## I.  Background

On August 20, 2008, Wu was served with notice to appear, charging that she illegally entered this country on August 2, 2008, without being admitted or paroled.  She conceded removability but filed an application for asylum, withholding of removal, and CAT relief based upon her alleged persecution by family-planning officials in China.  Wu contends that, while living in Fuzhou City, China in 2007, she became pregnant by her boyfriend.  She returned to her hometown of Lianjiang to see a doctor, who confirmed the pregnancy.  In China, it

2

is generally unlawful for women to become pregnant out of wedlock.  On February 20, 2008, three family-planning officials visited Wu's family home and, upon confirming she was unmarried, forced her to accompany them to the hospital.  According to Wu, she was then tied to an operating bed and a forcible abortion was performed, terminating her pregnancy.

Following the abortion, Wu was ordered to report to the family-planning office for weekly checkups.  She did not comply, instead choosing to return to Fuzhou City to work.  Family-planning officials then appeared at Wu's place of employment and ordered her supervisor to terminate her employment, which he did.  The officials next descended upon Wu's apartment, where they found her boyfriend, Shian Hu.  Wu and Hu were taken to the family-planning office, where Wu was given a pregnancy test and fined 20,000 renminbi.  She was additionally ordered to take a weekly pregnancy test and to receive family-planning education with Hu after each test.  Hu was fined 5,000 renminbi for illegal cohabitation.  Wu contends that family-planning officials continued to harass her and that she fled to the United States to escape persecution.

In support of her claim, Wu offered her own statement, written letters from her father and from Hu, a "Family Planning Birth Control Operation Certificate" stating an abortion had been performed, the receipt from the fines that she and Hu

3

had paid to the family-planning office, and a letter from her previous employer discharging her for violation of China's family-planning laws.

In response, the United States Department of Homeland Security, Immigration and Customs Enforcement (DHS) offered the 2007 China Profile of Asylum Claims and Country Conditions (Country Profile) and certain other documentary evidence.  The Country Profile noted that the legal age of marriage in China is 22 for men, that it is illegal "in almost all provinces" for unmarried women to bear children, and that unwed women who do have children are liable to pay "social compensation fees."  The Country Profile also stated that United States Embassy officials were unaware of any "abortion certificates," and that the only document that might resemble such a certificate is a document issued by hospitals following a voluntary abortion.  This document is used by patients to request the two weeks of sick leave to which Chinese law entitles them following a voluntary abortion.  The Country Profile further indicated that "[d]ocumentation from China, particularly from Fujian Province, is subject to widespread fabrication and fraud."

The Fujian Provincial Birth Planning Committee denied the occurrence of any forced abortions or sterilizations in Fujian in the prior ten years, but according to the Country Profile it was "impossible to confirm this claim, and, in 2006, reportedly, there were forced sterilizations in Fujian."  Finally, the Country Profile

4

noted that local physicians in contact with consular officials had reported no signs of forced abortions among patients since the 1980s, and though American consular officials found evidence of coercion through social pressure, they did not report any cases of forced abortions or sterilizations.

At the merits hearing, when asked how family-planning officials had known that she was pregnant, Wu responded, "I think that probably I was in the hospital check up and the doctor found out and told them." She also explained that the doctor called the family-planning officials "[p]robably [because] I was alone and no one [was] with me at that time." Wu testified that had her boyfriend, mother, or some other individual accompanied her to the clinic, the doctor would have likely asked have to see a marriage certificate.

The IJ denied Wu's application for asylum, withholding of relief, and request for CAT relief. He further entered an adverse-credibility determination, finding that Wu lacked credibility for five reasons: (1) Wu's story was implausible; (2) the Country Profile's statement that documentation from China, and particularly from Fujian, is subject to widespread fabrication and fraud; (3) the Country Profile's observation that there had been no cases of forced abortion in the prior ten years; (4) the Country Profile's report that U.S. Embassy officials were unaware of any "abortion certificates" and that the only document

5

resembling such a certificate was in fact given after a voluntary abortion; and (5) the fact that the purported abortion certificate was not authenticated, as required by 8 C.F.R. § 1287.6. The IJ further explained that, though it was only "a minor factor," he was dubious of the "circuitous route" Wu's documentation had taken to get to the United States, as the exhibits she entered were mailed to some unknown person in Hong Kong before being forwarded on to Wu's attorney. As to the first factor, implausibility, the IJ explained:

> I find that the respondent's testimony is not plausible. Her testimony is that on February 15, 2008, she went to this clinic alone to have this pregnancy test. The people at the clinic did not ask her if she was married. She did not tell them she was single. She just showed up there alone. They conduct this pregnancy test and confirm that she is pregnant. It just seems suspicious to me, or unusual or odd, that five days later the family[-]planning officials would just show up at her home just based on that one pregnancy test.

> The respondent's explanation is that this whole scenario to the people at the hospital was unusual and suspect. That simply when a woman shows up by herself, that that is suspicious circumstances to them. If she had showed up with her mother or her boyfriend, for example, they would have asked for a marriage certificate. But, if she shows up by herself, apparently the doctors there for some reason notify the family[-]planning officials. It just seems implausible to me. This is just one factor, but when I consider this along with the other evidence of record, it just places the respondent's credibility in question. It seems more likely that if a single female shows up, that would arouse the suspicions of the family[-]planning officials and they would then say, okay, where is your marriage certificate. The respondent's testimony is contrary to that. It is if you show up with your mother or somebody else or your boyfriend or your husband or a man they still

6

ask for the marriage certificate.

The IJ emphasized that this first implausibility finding was only one of the five factors that led to his adverse-credibility determination. Based on these findings, however, he entered an adverse-credibility determination and found that Wu had not demonstrated she suffered from past persecution (i.e., that she had undergone a forced abortion).

Finally, the IJ determined that Wu did not have a well-founded fear of future persecution because her only fear was of being arrested, fined, or forced to attend family-planning classes, all of which are insufficient to constitute persecution. Because she had failed to sustain the lower burden of proof for asylum, the IJ found that she necessarily failed to carry the higher burden for withholding of removal or CAT relief.

Wu appealed to the BIA, which dismissed the appeal. According to the BIA, the IJ's adverse-credibility determination was not clearly erroneous:

> [W]e agree that it seems implausible that the respondent would have presented herself for a pregnancy examination as an unaccompanied female and not been asked for a marriage certificate or other proof of her marital status. Even if this were to be considered improper speculation or conjecture on the part of the Immigration Judge, this was not the *sole* basis for his adverse[-]credibility finding.
>
> The Immigration Judge also noted that the respondent submitted a medical "certificate" purportedly confirming her forced abortion in

7

February 2008.  However, we agree that this "certificate" is entitled to limited weight, as it is an unauthenticated photocopy which, on its face, does not even indicate whether the abortion was voluntary or mandatory.  Moreover, the Department of State's 2007 *Profile of Asylum Claims - China* ("2007 *Profile*") states that United States embassy and consulate general official are unaware of any certificates issued for involuntary abortions.  Rather, the 2007 *Profile* indicates that hospitals might issue, upon a patient's request, a certificate following a *voluntary* abortion.

(emphasis in original) (internal citations omitted).

The BIA accordingly concluded that because she had not provided credible testimony or corroborated her claims, Wu was not eligible for asylum or withholding of removal.  Finally, the BIA found that because Wu had failed to meaningfully address the IJ's denial of CAT relief in her notice of appeal or appellate brief, the CAT issue merited no discussion.  The instant petition followed.

## II.  Discussion

### A.  Subject-Matter Jurisdiction

As a threshold matter, we note that we are without jurisdiction to consider Wu's appeal of the denial of her request for CAT relief.  We review our subject-matter jurisdiction de novo.  *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1231 (11th Cir. 2007).  A court may not consider a claim raised in a petition to review a final order unless the petitioner has first exhausted her administrative

8

remedies with regard to that claim.  INA § 242(d)(1); 8 U.S.C. § 1252(d)(1).

Thus, if an alien fails to raise her claim before the BIA, "we lack jurisdiction to

consider it under the clear dictates of circuit precedent."  *Amaya-Artunduaga v.*

*U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam).  As such,

Wu's petition for review of the denial of her request for CAT relief is dismissed

for want of jurisdiction.

### B. Standard of Review

With regard to the remaining issues, "[t]he appropriate standard of review is

well-settled."  *Mazariegos v. Office of U.S. Att'y Gen.*, 241 F.3d 1320, 1323 (11th

Cir. 2001).  We review "administrative fact findings under the highly deferential

substantial evidence test."  *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026–27 (11th

Cir. 2004) (en banc).  Under that standard, we "must affirm the BIA's decision if it

is supported by reasonable, substantial, and probative evidence on the record

considered as a whole."  *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir.

2001) (internal quotation marks omitted).  "When the BIA issues a decision, we

review only that decision, except to the extent the BIA expressly adopts the IJ's

decision."  *Chacon-Botero v. U.S. Att'y Gen.*, 427 F.3d 954, 956 (11th Cir. 2005)

(per curiam).  If the BIA explicitly agreed with particular findings of the IJ, we

review both the BIA and the IJ's conclusions regarding those issues.  *Ayala v. U.S.*

*Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010).  In the instant case, the BIA issued its own decision but adopted much of the IJ's reasoning with regard to the adverse-credibility determination, and we accordingly review both opinions.

### C.  Asylum

An alien who is present in the United States may apply for asylum.  INA § 208(a)(1), 8 U.S.C. § 1158(a)(1).  The Secretary of the Department of Homeland Security or the Attorney General may grant asylum if the alien first demonstrates that she qualifies as a "refugee."  INA § 208(b)(1), 8 U.S.C. § 1158(b)(1)(A).  A "refugee" includes, *inter alia*, "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program."  INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).

An applicant bears the burden of establishing eligibility for asylum "by offering 'credible, direct, and specific evidence in the record.'"  *Forgue*, 401 F.3d at 1287 (quoting *Sangha v. I.N.S.*, 103 F.3d 1482, 1487 (9th Cir. 1998)).  If an alien is found to be credible, her testimony may be sufficient, standing alone and without corroboration, to satisfy her burden of establishing eligibility for asylum. *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1276 (11th Cir. 2009).  "Likewise, a denial of asylum can be supported solely by an adverse[-]credibility determination,

10

especially if the alien fails to produce corroborating evidence." *Id.* at 1276–77.


D. Adverse-Credibility Determination

The REAL ID Act of 2005, Pub. L. No. 109-13 § 101, 119 Stat. 302 (2005),

governs credibility determinations with regard to applications for asylum or

withholding of removal filed after May 11, 2005.  8 U.S.C. § 1158(b)(1)(B)(iii).  It

provides:

> Considering the totality of the circumstances, and all relevant factors,
> a trier of fact may base a credibility determination on the demeanor,
> candor, or responsiveness of the applicant or witness, the inherent
> plausibility of the applicant's or witness's account, the consistency
> between the applicant's or witness's written and oral statements
> (whenever made and whether or not under oath, and considering the
> circumstances under which the statements were made), the internal
> consistency of each such statement, the consistency of such
> statements with other evidence of record (including the reports of the
> Department of State on country conditions), and any inaccuracies or
> falsehoods in such statements, without regard to whether an
> inconsistency, inaccuracy, or falsehood goes to the heart of the
> applicant's claim, or any other relevant factor. There is no
> presumption of credibility, however, if no adverse credibility
> determination is explicitly made, the applicant or witness shall have a
> rebuttable presumption of credibility on appeal.

*Id.*  "As with other factual findings, '[c]redibility determinations likewise are

reviewed under the substantial evidence test." *Forgue*, 401 F.3d at 1286 (quoting

*D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004)).  "The trier of

11

fact must determine credibility, and this court may not substitute its judgment for that of the BIA with respect to credibility findings." *D-Muhumed*, 388 F.3d at 818. Indeed, "[a] credibility determination, like any fact finding, may not be overruled unless the record compels it." *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006) (per curiam) (alteration in original) (internal quotation marks omitted).

That said, if an IJ makes an adverse-credibility finding, he "must offer specific, cogent reasons" to support his conclusion, *Forgue*, 401 F.3d at 1287, and "[i]t is appropriate for us to reverse when a credibility determination is based solely on speculation and conjecture," *Tang*, 578 F.3d at 1278. Once an adverse-credibility determination is made, "[t]he burden then shifts to the alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence." *Chen*, 463 F.3d at 1231 (quoting *Forgue*, 401 F.3d at 1287).

As explained previously, the IJ's adverse-credibility determination in the instant case was based on five factors that break down roughly into two groups. First, he found Wu lacking in credibility due to the overall implausibility of her story. Second, he relied on the general inconsistency between Wu's account and the Country Profile, as well as her failure to authenticate the documentary

12

evidence she offered in support of her claims.  For clarity and ease of analysis, we address each group in turn.

### 1.  Implausibility

In upholding the adverse-credibility determination with respect to Wu, the BIA agreed with the IJ that "it seems implausible that [Wu] would have presented herself for a pregnancy examination as an unaccompanied female and not been asked for a marriage certificate or other proof of her marital status."  We have previously stated that "[i]t is appropriate for us to reverse when a credibility determination is based solely on speculation and conjecture."  *Tang*, 578 F.3d at 1278.  Here, the IJ's repeated references that Wu's story "just seems suspicious to me" or "just seems implausible to me" evince a determination made on personal perception or whim, not evidence.  Neither the BIA nor the IJ cited to any record evidence to support their conclusion that Wu's story was implausible, or that Chinese doctors are required to (or even routinely do) inquire as to a patient's marital status when administering a pregnancy test.  Nor is Wu's account, in our view, implausible on its face.

We are mindful that our review of an IJ's credibility determination is extremely deferential, and we will rarely disturb the credibility determinations of the administrative fact-finder in cases such as these.  Nonetheless, "we require that

13

credibility determinations made by an IJ rest on substantial evidence, rather than on conjecture or speculation." *Todorovic v. U.S. Att'y Gen.*, 621 F.3d 1318, 1325 (11th Cir. 2010).  Our review of the record reveals no evidence to support the IJ's suspicious view of Wu's story.  "To the extent that the IJ based his adverse[-] credibility determination on his personal perceptions about the reasonableness of [Wu's story], his determination is not supported by *any evidence*—let alone by substantial evidence due deference."  *Tang*, 578 F.3d at 1278 (emphasis in original).  In the absence of evidence to support it, an IJ's bald assertion that a given account is implausible does not necessarily make it so.  Thus, and though the substantial evidence standard greatly constrains our examination of the IJ's findings, even its yoke does not bind us where, as here, the IJ's conclusion fairly appears to have been invented out of whole cloth.  *See id.* (reversing adverse-credibility determination based in part on IJ's speculative assertion that "[the applicant's] mother would not have violated Chinese law in order to protect her daughter").  As such, the BIA's implausibility finding cannot support its adverse-credibility determination.

## 2.  Other Factors

Having found that the IJ's finding of implausibility cannot support his adverse-credibility determination, we turn our focus to the other factors given in

14

support of his decision.  The IJ relied on four other factors in finding that Wu was not credible: (1) the Country Profile's statement that documentation from Fujian is subject to widespread fraud; (2) the Country Profile's report that, according to the Fujian Provincial Birth Planning Committee, there had been no forcible abortions in the prior ten years; (3) the Country Profile's indication that U.S. Embassy officials were unaware of any "abortion certificates" and that the only document resembling such certificates were given after voluntary abortions; and (4) the fact that the purported abortion certificate was not authenticated.  The first three of these factors hinge exclusively on the alleged inconsistency of Wu's account with a State Department report—the Country Profile.  The question thus reduces to whether the IJ's sole reliance on State Department reports and a failure to authenticate constitute "specific, cogent reasons" for a finding that Wu was not credible.  *Chen*, 463 F.3d at 1231.

We have consistently indicated that the BIA and IJ are "entitled to rely heavily" upon State Department country reports.  *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004); *see Imelda v. U.S. Att'y Gen.*, 611 F.3d 724, 728 (11th Cir. 2010) ("We have held that the BIA may rely heavily on State Department reports about a country."); *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1175 (11th Cir. 2008) (same); *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1259

15

(11th Cir. 2006) (per curiam) (same).  At the same time, however, "[u]se of country reports cannot substitute for an analysis of the unique facts of each applicant's case." *Imelda*, 611 F.3d at 729 (alteration in original) (internal quotation marks omitted).

We have also previously intimated that blind reliance on State Department reports, without more, may be insufficient to satisfy the requirement that an adverse-credibility determination be supported by "specific, cogent reasons." *Xia v. U.S. Att'y Gen.*, 608 F.3d 1233, 1240 (11th Cir. 2010).  In *Xia*, we upheld the denial of asylum and withholding of removal of an applicant who claimed to have undergone a forcible abortion in Fujian Province after she became pregnant out of wedlock.  *Id.* at 1234–35.  The IJ in *Xia* made an adverse-credibility determination, relying in part of State Department country reports that were inconsistent with the applicant's claims.  *Id.* at 1238.  We noted that "[w]hile it is clear from the record that the State Department Reports played some role in the IJ's decision to deny Xia's claims . . . [they] were by no means the only findings the IJ made that led her to deny Xia's claims for failure of proof and lack of credibility."  *Id.*  We took pains to emphasize that the adverse-credibility determination was not solely the product of the State Department reports; the IJ, we explained, had also "based her adverse[-]credibility determination on several of

16

Xia's testimonial infirmities." *Id.* at 1237. These infirmities included the fact that Xia had stated she was eighteen when the abortion was performed when records in evidence revealed she in fact would have been nineteen, as well as the IJ's finding it incredible that the applicant would have started attending college at the very time her pregnancy would have become visible. *Id.*

We also took care in *Xia* to distinguish the Seventh Circuit's contrary result in *Dong v. Gonzales*, 421 F.3d 573 (7th Cir. 2005). In *Dong*, the Seventh Circuit confronted a nearly identical factual scenario to that presented here: a Chinese woman from Fujian province sought asylum, claiming she had been subjected to a forced abortion because she became pregnant before marriage. *Id.* at 574. She also claimed, as Wu claims here, that family-planning officials simply showed up at her home after tests at a hospital revealed her to be pregnant, and though "she did not know why the officials came to her house, . . . she speculated that they had been tipped off about her pregnancy by someone at the hospital where she had recently confirmed the fact." *Id.* at 575.

The Seventh Circuit reversed the IJ's denial of asylum. *Id.* at 580. It first rejected the IJ's finding that the applicant's story was not plausible, explaining that "nothing in the record . . . affirmatively supports the IJ's assumption that village officials would not act as Dong described." *Id.* at 577. The IJ had also

17

based his adverse-credibility determination on perceived inconsistencies between the applicant's statement and State Department reports, but the Seventh Circuit rejected these bases, too. *Id.* at 578. First, the court said, the State Department reports were not necessarily inconsistent with the applicant's claims: "Neither the [Country] Profile nor the Country Report rule out the possibility that forced abortions occur; thus, the IJ erred in relying on these reports to find Dong not credible." *Id.* at 578. Further, and perhaps more important, the court took issue with the IJ's reliance on State Department reports to discount the applicant's credibility, explaining that "an IJ should not rely on generalized Profiles or Country Reports to refute an applicant's personal experience." *Id.* at 578; *see also Bace v. Ashcroft*, 352 F.3d 1133, 1139 (7th Cir. 2003) ("[I]t would be improper to find that a witness's testimony about specific events could be 'contradicted' by a generalized State Department report broadly discussing conditions in the applicant's country of origin.").

Moreover, in our decision in *Xia*, we paused to expressly distinguish *Dong*, explaining:

> In this case, in contrast to *Dong*, the IJ gave well-explained reasons for finding Xia's account not credible. The IJ was more than merely skeptical about Xia's account; the IJ listed several discrepancies and omissions that rendered it less than believable. Those reasons still stand even if the State Department Reports are removed from

18

consideration, as Xia's testimony included at least one internal inconsistency (how old she was when she had the abortion) and one omission (identifying data on the abortion operations certificate).

608 F.3d at 1240. From our decision in *Xia*, then, it follows naturally that though State Department reports are helpful in ascertaining an applicant's credibility, they cannot serve as the sole basis for refuting an otherwise consistent and plausible statement.

Turning to the instant case, once we remove the IJ's improper implausibility finding from consideration, it is plain that Wu's claim contains none of the internal inconsistencies or omissions that led to our result in *Xia*. To the contrary, and as in *Dong*, neither the IJ nor the BIA took issue with Wu's demeanor or found any internal consistency in her statements. In other words, nothing about Wu *in this particular case* was found lacking in credibility. Instead, the BIA and IJ concluded that Wu lacked credibility because the substance of her story did not conform to State Department accounts of life in China. Our precedent, however, dictates that the "[u]se of country reports cannot substitute for an analysis of the unique facts of each applicant's case." *Imelda*, 611 F.3d at 729. In the absence of any finding as to Wu's demeanor, the consistency of her statements, or some other individualized reason for questioning her credibility, we cannot say that the IJ's adverse-credibility determination was supported by "specific, cogent reasons."

19

*Forgue*, 401 F.3d at 1287.

That result makes good sense, too. Were we to imbue State Department reports with dispositive power as to an applicant's credibility, large swaths of applicants might be talismanically rendered lacking in credibility simply because the substance of their claims was contrary to that contained in a static country profile. Such a mechanism would vitiate the individualized determination our precedent requires. That cannot be—nor is it—the law. *See Imelda*, 611 F.3d at 728–79 (concluding that the BIA erred in relying solely on the State Department's country report for Indonesia because it did not conduct an individualized analysis in determining whether a fundamental change in circumstances had occurred); *cf. Xia*, 608 F.3d at 1240 (explaining that "the IJ's adverse[-]credibility determination rested on far more than those two documents).

Further, and even if inconsistency with State Department reports were sufficient to render an applicant incredible, we fail to see how Wu's statement in this case was in fact inconsistent with the Country Profile on which the IJ so heavily relied. The Country Profile does not rule out the possibility that forced abortions occur in Fujian Province. In fact, in the sentence after the Fujian Provincial Birth Planning Committee's denial of any forced abortions within the past ten years, the Country Profile explains: "It is impossible to confirm this claim,

and, in 2006, reportedly, there were forced sterilizations in Fujian." Elsewhere in the Country Profile, the State Department writes, "[t]hough the government claims to have stopped using forced abortions and sterilizations, which are now contrary to birth planning regulations, forced abortions and sterilizations continue to occur due to uneven implementation at the local level and ongoing pressure to keep birthrates low."

Moreover, though the IJ also relied upon the Country Profile's report that documents from Fujian are frequently counterfeited and that the only "abortion certificates" of which Embassy officials are aware are given after voluntary procedures, that does not necessarily mean that no certificates are given out after involuntary abortions—it simply means that Embassy officials are *unaware* of any such certificates. Additionally, the Country Profile statement that "[i]t is possible that the holder of a document indicating a requested voluntary abortion may, in fact, have only submitted to an abortion as a result of pressure" openly suggests that more may well be afoot, and certainly does not rule out the possibility that individuals might be given an abortion "certificate" following an involuntary procedure. In other words, though the Country Profile does not necessarily bolster or support Wu's contentions, neither does it refute them. At any rate, such tangential "inconsistency," standing alone and considered in the totality of the

21

circumstances, is insufficient to serve as the sole basis for the IJ's finding that Wu is without credibility.

Finally, and as to the IJ's finding that Wu lacked credibility in part because the documentation she offered had not been authenticated and had taken a circuitous route to the United States, we agree that "we cannot depend of [the] veracity" of unauthenticated documents, *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1202 n.3 (11th Cir. 2005), and that the IJ was therefore within his discretion to discount the certificate as lacking in probative value. But for an IJ to give little weight to Wu's evidence in support of her claims is, in our view, an entirely different matter from the individualized assessment of her credibility—based upon "the totality of the circumstances"—the asylum statute commands. 8 U.S.C. § 1158(b)(1)(B)(iii). Therefore, Wu's failure to authenticate the abortion certificate may mitigate the probative value of her corroborative evidence, but it has little, if any, bearing on whether her testimony was credible in and of itself. *See Yang*, 418 F.3d at 1201 ("The weaker an applicant's testimony, . . . the greater the need for corroborative evidence.").

We emphasize one final point in closing: it does not necessarily follow from our result here that Wu will ultimately succeed in her bid for asylum. A finding that an applicant is credible does not *a fortiori* require a finding that the applicant

22

has adduced the "credible, direct, and specific evidence in the record" necessary to establish eligibility for asylum. *Forgue*, 401 F.3d at 1287; *see Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1240 (11th Cir. 2006) (affirming denial of asylum despite applicant's having been found credible); *Huang v. U.S. Att'y Gen.*, 429 F.3d 1002, 1007 (11th Cir. 2005) (per curiam) (same). Indeed, if Wu fails to adduce the quantum of evidence necessary to establish her entitlement to asylum, her claim may well be denied on remand due to a paucity of evidence. But on this record, and in the absence of any individualized reason to question Wu's credibility, the generalized Country Profile so heavily relied upon by the IJ cannot, without more, serve as the sole predicate for a finding that Wu is not credible. Accordingly, and although we dismiss that portion of Wu's claim relating to CAT relief for want of subject-matter jurisdiction, we grant the petition as it relates to the BIA's adverse-credibility determination, vacate the BIA's decision, and remand for further proceedings consistent with this opinion.

**PETITION DISMISSED IN PART, GRANTED IN PART, VACATED AND REMANDED.**