[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15069
Non-Argument Calendar
_____

Agency No. A088-012-568

IRINA LUCHINA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(May 9, 2017)

Before MARTIN, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Irina Luchina, a native and citizen of Moldova, petitions for review of the Board of Immigration Appeals's ("BIA") dismissal of her appeal of the Immigration Judge's ("IJ") denial of her application for withholding of removal pursuant to the Immigration and Nationality Act ("INA"). Before the IJ, Luchina contended that, because of her Romani (gypsy) ethnicity, she had been persecuted in the past while living in Moldova and, if returned, she would be persecuted again. The IJ found that Luchina's testimony was not credible, that she had failed to provide reasonably available corroborating evidence, and that she did not establish either past persecution or a likelihood of future persecution. Luchina appealed the IJ's decision to the BIA, but, significantly, she did not challenge the IJ's findings as to her credibility or to the need for corroborating evidence. The BIA affirmed and adopted the IJ's decision.

In her petition for review before this Court, Luchina challenges each aspect of the IJ's decision. She contends that the adverse credibility determination was not supported by specific, cogent reasons, that the IJ made unreasonable demands for corroborating evidence, and that the evidence she produced was sufficient to show both past persecution and a likelihood of future persecution on account of her ethnicity. However, because she did not challenge before the BIA the findings as to her credibility and to the need for corroboration, we lack jurisdiction to consider these arguments on appeal. And because these findings are dispositive as to her

2

claim of past persecution, we deny the petition as to this claim.  With regard to Luchina's claim of future persecution, substantial evidence in the record supports the IJ's determination that there was not a clear probability that Luchina would suffer persecution if returned to Moldova.  Accordingly, we dismiss in part and deny in part the petition for review.

## I.  Background

Luchina is a native and citizen of Moldova who entered the United States in May 2009 with authorization to remain until September 2009.  In August 2011, the Department of Homeland Security ("DHS") served her with a notice to appear, charging that she was removable for having overstayed her visa.

Luchina conceded removability and, in October 2013, Luchina filed an application for withholding of removal.[1]  Luchina claimed that, as an ethnic Romani in Moldova, she had faced discrimination, beatings, and threats by both government agents and Moldovan citizens.  She feared being harassed, raped, abused, or killed if she returned to Moldova.

*A.*    *Luchina's Application and Supporting Evidence*

---

[1] Luchina also applied for relief under the United Nations Convention Against Torture ("CAT"), but she does not challenge the agency's denial of CAT relief in this petition for review. Accordingly, we deem Luchina's claim for CAT relief abandoned. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not briefed on appeal are abandoned).

At the merits hearing on her application in April 2014, Luchina, represented by counsel, testified primarily through an interpreter. We first summarize this testimony before discussing the other evidence she submitted.

Luchina was born in 1988 in a village on the eastern side of Moldova near the border with Transnistria, a breakaway region of ambiguous legal status. Luchina was considered to be of Romani ethnicity because her father is Roma, while her mother is Moldovan. Luchina's village was small, so everyone knew that she and her father were Roma, and people in her village used derogatory names towards her.

In the early 1990s, when she was five or six years old, Luchina and some other children went to a river near the border with Transnistria where Moldovan military personnel were present. One of the soldiers picked her up and threw her into the river, stating, "Even if she's going to drown, there's not much of a loss. One gypsy more, one gypsy less, that doesn't count." She did not know how to swim, but she was able to make it back to the bank of the river. On other occasions, military personnel would take her bicycle from her, push her to the ground, and spit on her. Luchina explained that the soldiers knew her ethnicity because they interacted with the villagers and because her physical appearance and clothing made her recognizable as Roma anywhere in Moldova.

4

In primary school, other kids often would push Luchina around, drag her by her hair, trip her, and kick her after she fell, even though her teacher at the time was a family friend who tried to protect her.  When she transferred to middle school, her teacher placed her in the last desk in the class because she was tall and a gypsy, and she would be punished if she tried to talk to her classmates.  Her parents complained about the teacher's treatment, and Luchina was transferred to a different class because it had the fewest students in it.  Also, when she was in seventh grade, a classmate kicked her in the head during a game.  Luchina and her parents complained to the director of the school and her teacher, but the other child was not disciplined in any way.

In May 2003, Luchina was attacked by a police officer while participating in a 5K run with her classmates.  As the class passed by a police station, one of the officers, whom Luchina identified by name, grabbed her by the hair, threw her to the ground, and began kicking her repeatedly.  The officer hit or kicked her more than five times, fracturing her collarbone, and then grabbed her from the ground and threw her into the crowd of her classmates.  The officer claimed that he had the full right to do that to her because she was nobody.  The officer said a slur that, according to Luchina, roughly translated to "gypsy throwing," "dirty blood," or "second-grade human being."  When she tried to file a police report, she was told that she was young, would heal, and should just go home.

5

Luchina attended the Technical University of Moldova in the capital city of Chisinau. While in a park in Chisinau in December 2006, Luchina was approached by two police officers who were on patrol. The officers checked Luchina's documents and then proceeded to beat her "quite severely," causing big bruises on the side of her body. The officers said that "dirty gypsies" had no place in the city and that she should go back to her village and milk cows. She reported the incident but she did not have the officers' names, so the case was closed. Luchina's mother tried but was unable to obtain the police report.

In August 2008, a Moldovan SWAT team raided her family's house in search of guns left over from the 1992 war with Transnistria. The SWAT officers said that her family, as gypsies, must have something hidden because gypsies usually did. She stated that the officers hit her father and shut her and her brother in a storage shed near the house. After the raid, Luchina's father was fined $500 because the officers claimed to have found a bullet casing.

Luchina entered the United States in May 2009 on a J-1 non-immigrant visitor visa. She was arrested in February 2011 and went to trial for participating in a prostitution ring. She was acquitted on all charges, but she made the news back in Moldova. In December 2013, her brother was beaten up by an officer of the village who said it would not be good for Luchina to come back if she were a "dirty gypsy prostitute." Later, her father was beaten up by the same officer.

6

Luchina stated that relocation within Moldova would not make much sense, because the country was small, the people were all the same, and she would not be able to hide.  She feared that someone would kill her if she returned.

In addition to her own testimony, Luchina submitted the U.S. Department of State's 2013 Country Report on Human Rights Practices in Moldova ("State Department report"), a Roma National Center report on Roma rights in Moldova, and a BBC News article that described an Amnesty International report.  She also submitted her birth certificate, which states that she is Roma gypsy.

The State Department report stated that the Roma were one of the most vulnerable minority groups in the country and often were subject to social marginalization and societal discrimination, including denial of medical services and discrimination in the job market.  According to the report, the Roma had lower levels of education, more limited access to healthcare, and higher rates of unemployment.  Further, the report noted that, consistent with Luchina's testimony, hazing and segregation of Roma students were problems in Moldovan schools.  The report stated that the government had approved a decision to establish mediators within Roma communities who could improve communication, mediate disputes, and facilitate access to public services for the Roma.

The Roma National Center report likewise described a range of hardships suffered by Roma gypsies in Moldova, including:  low levels of employment;

7

inadequate housing; low scores on health indicators; inadequate social policies and high dependence on state assistance; discriminatory attitudes among teachers; and discrimination, hostility, and abusive behavior by law enforcement. The report also noted that the Moldovan Constitution established the principle of equality under the law without distinction to race, nationality, ethnic origin, or language, and that the government had made some legislative efforts to combat discrimination.

The Amnesty International report described in the BBC News article called discrimination against the Roma in Europe "shocking" and found that racially motivated crimes against the Roma were widespread. But the report also found that governments throughout Europe had made efforts to improve the social inclusion of the Roma.

## B.    The IJ's Decision

The IJ denied Luchina's application for withholding of removal and ordered her removed to Moldova. After summarizing Luchina's testimony, the IJ made an adverse credibility determination. The IJ stated that there were "significant internal inconsistencies" in her testimony but gave just one clear example. Specifically, the IJ found that Luchina's testimony was inconsistent about whether the injury she suffered in 2003 was to her arm or her collarbone. The IJ also discounted Luchina's testimony because the connection to her ethnicity for some

8

of the later attacks, "particularly the most recent ones," was supplied only after her attorney asked her leading questions.  Finally, the IJ suggested that the lack of evidence corroborating Luchina's testimony, such as letters from family members, medical records, or Moldovan news articles regarding her prostitution arrest, undermined her credibility.

The IJ went on to conclude that Luchina's claim of past persecution still would be denied even if her testimony were credible.[2]  The IJ found that the mistreatment Luchina described was not severe enough to qualify under the standard for "persecution."  The IJ determined that the past events discussed in Luchina's testimony "were relatively minor except for the broken arm."  Acknowledging that being thrown into a river could potentially be fatal, the IJ found that, in light of Luchina's "scarce testimony" about this event, it was difficult to tell how serious the act was.  Regarding the abuse she suffered from her classmates in school, the IJ found that "the teachers were willing to help her" and that she had been moved to a more favorable class when she complained about mistreatment.  Apparently referencing Luchina's encounter with police officers in the capital city of Chisinau, the IJ found that this was a "relatively minor" incident causing only "some bruises."  Moreover, the IJ stated, Luchina did not describe

---

[2] The IJ also appears to have found that Luchina's testimony failed to establish a nexus, or "tie-in," between the past incidents and her Roma ethnicity.  But, assuming her credibility, Luchina's testimony established a nexus between the attacks and her ethnicity for the vast majority of incidents, even if there was some doubt as to a few of them.

any additional incidents after the 2008 SWAT raid, apart from the attacks on her brother and father, which appeared to be tied to her arrest for prostitution, not her ethnicity.

The IJ also concluded that Luchina had not met her burden of establishing future persecution. Giving great weight to the State Department report, which the IJ found consistent with the other reports submitted by Luchina, the IJ stated that there was widespread discrimination in Moldova against the Roma, who were among the most vulnerable minorities in Moldova and often subjected to social marginalization and discrimination. But the IJ found that the level of discrimination did not amount to a pattern or practice of persecution in which the government was complicit, nor did the evidence show that the government was unwilling or unable to protect Luchina. The IJ noted that the country-conditions evidence indicated that the government had taken steps to improve relations between Roma communities and local public authorities, and that there was national legislation prohibiting discrimination. The IJ further explained that he "d[id] not doubt that there is discrimination and life may not be pleasant there, but it does not rise to the level of persecution as described in the Eleventh Circuit." The fact that her family has continued to live in Moldova since at least 2003 "without incident," other than the one incident in 2008 involving the search of their

10

home for weapons and ammunition, was "evidence that she could return there," the IJ concluded.

Noting that it was Luchina's burden to show by "clear probability that her life would be threatened on account of one of the five protected grounds," the IJ found that Luchina had not carried her burden to establish withholding under the Act "due to her lack of credibility, her testimony, which was not detailed or specific, including the fact that there was a lack of nexus to her Roma origins until let on by her attorney, her lack of corroboration, [and] the long time that her family has lived there without significant harm."

Luchina appealed the IJ's decision to the BIA, contending that her testimony and the country-conditions evidence were sufficient to establish both past persecution and future persecution. The BIA adopted and affirmed the IJ's decision and dismissed Luchina's appeal, stating that Luchina had "not pointed to a clear factual or legal error in the Immigration Judge's decision beyond stating that she ha[d] met her respective burden of proof." Luchina now petitions this Court for review of the denial of her application for withholding of removal.

## II.  Standards of Review

We review only the BIA's decision except to the extent that the BIA expressly adopts the IJ's opinion or reasoning. *Seck v. U.S. Att'y Gen.*, 663 F.3d

1356, 1364 (11th Cir. 2011).  Here, the BIA adopted and affirmed the IJ's decision, so we review the decisions of both the BIA and the IJ.

We review factual determinations, including adverse credibility determinations, under the substantial evidence test.  *Xiu Ying Wu v. U.S. Att'y Gen.*, 712 F.3d 486, 492–93 (11th Cir. 2013).  "Under that standard, we must affirm if the [agency's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *Id.* at 492 (internal quotation marks omitted).  We "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision."  *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (*en banc*).  Findings of fact may be reversed only when the record compels a contrary conclusion; "the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings."  *Id.*

We review our subject-matter jurisdiction *de novo*.  *Gonzalez-Oropeza v. U.S. Att'y Gen.*, 321 F.3d 1331, 1332 (11th Cir. 2003).  We are obligated to inquire into our subject-matter jurisdiction whenever it may be lacking.  *Lenis v. U.S. Att'y Gen.*, 525 F.3d 1291, 1292 (11th Cir. 2008).

## III.  Discussion

To be eligible for withholding of removal under the INA, the applicant must show that her life or freedom would be threatened in the proposed country of

removal on account of her race, religion, nationality, membership in a particular social group, or political opinion.  8 C.F.R. § 208.16(b).  The applicant bears the burden of showing that she would more likely than not be persecuted or tortured upon return to her country.  *Mendoza v. U.S. Att'y Gen.,* 327 F.3d 1283, 1287 (11th Cir. 2003).  This burden may be met in two ways:  (1) establishing past persecution in her country based on a protected ground, which creates a rebuttable presumption of future persecution or (2) demonstrating a future threat to her life or freedom in her country based on a protected ground.  *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1375 (11th Cir. 2006); *Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 437 (11th Cir. 2004); *see* 8 C.F.R. § 208.16(b)(2).

In determining whether an applicant has satisfied her burden of proof, the IJ must "weigh the credible testimony along with other evidence of record."  8 U.S.C. § 1158(b)(1)(B)(ii).[3]  An applicant's testimony alone may establish her claim for withholding of removal, but only if it is credible and persuasive, and it references specific facts that are sufficient to show that she is a refugee.   8 U.S.C. § 1158(b)(1)(B)(ii).  Conversely, a denial of withholding of removal can be supported solely by an adverse credibility determination when the applicant fails to produce corroborating evidence.  *Xiu Ying Wu*, 712 F.3d at 493

---

[3] The standards for evaluating evidence and credibility in asylum cases, 8 U.S.C. § 1158, also apply to applications for withholding of removal.  *See* 8 U.S.C. § 1231(b)(3)(C) (incorporating § 1158(b)(1)(B)(ii)–(iii)); *see also Niftaliev v. U.S. Att'y Gen.*, 504 F.3d 1211, 1215 (11th Cir. 2007).

13

If the IJ determines that an applicant is not credible, "the IJ must make an explicit adverse credibility finding and offer 'specific, cogent reasons' for the finding." *Shkambi v. U.S. Att'y Gen.*, 584 F.3d 1041, 1049 (11th Cir. 2009). Once an adverse credibility determination is made, the applicant must demonstrate that the finding was not supported by "specific, cogent reasons" or was not based on substantial evidence. *Id.*

Where the IJ determines that the applicant should provide evidence that corroborates otherwise credible testimony, the applicant must provide such evidence unless she cannot reasonably obtain it. *See* 8 U.S.C. § 1158(b)(1)(B)(ii). A failure to provide reasonably available corroborating evidence may lead to a finding that the applicant failed to meet her burden of proof. *See id.*

## A.    *Adverse Credibility Determination*

Luchina first challenges the IJ's adverse credibility determination. She contends that the three reasons offered by the IJ in support of that determination— (1) "significant internal inconsistencies" in her testimony, (2) leading questions from her attorney about the nexus to her ethnicity for some of the attacks, and (3) the lack of corroborating evidence—are not "specific, cogent reasons" supported by substantial evidence in the record.

Luchina asserts that the one inconsistency in her testimony identify by the IJ—whether the police officer fractured her "arm" or her "collarbone"—was

immaterial given that she testified through an interpreter, she clarified her testimony by pointing to the location of the fracture, and she was never asked to explain the purported inconsistency. Additionally, Luchina contends that her attorney's supposed leading questions did not provide a cogent reason for the adverse finding because the vast majority of her testimony established the nexus to her ethnicity without assistance, the leading question on one occasion actually came from the IJ, and the IJ never adequately admonished her attorney to avoid asking such questions. Finally, Luchina argues that the lack of corroborating evidence alone is not a sufficient basis to make an adverse credibility determination because such a finding is inconsistent with the standard that uncorroborated testimony may be sufficient to meet her burden of proof.

The problem with these arguments, however, is that Luchina never raised them or anything like them before the BIA. Petitioners challenging a final order of removal must exhaust "all administrative remedies available to [them] as of right." 8 U.S.C. § 1252(d)(1). And "we lack jurisdiction to consider a claim raised in a petition for review unless the petitioner has exhausted [her] administrative remedies with respect thereto." *Amaya–Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250–51 (11th Cir. 2006). That means that where, as here, a petitioner "fails to challenge an adverse credibility determination in [her] appeal to the BIA, we lack jurisdiction to consider such a challenge in [her] petition for review." *Id.*

15

In order to exhaust a claim before the BIA, the petitioner must raise the "core issue" before the BIA and present "any discrete arguments he relies on in support of that claim." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016). "While exhaustion does not require a petitioner to use precise legal terminology or provide well-developed arguments to support his claim, it does require that the petitioner provide information sufficient to enable the BIA to review and correct any errors below." *Id.* (internal quotation marks omitted). Thus, a petitioner must present more than unadorned, conclusory statements and "must do more than make a passing reference to an issue." *Id.* "These requirements further the purpose of exhaustion: to give the agency a full opportunity to consider the petitioner's claim and to compile a record that will be adequate for future judicial review." *Id.*; *see Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1298 (11th Cir. 2015) ("Unless a petitioner raises a purely legal question, the BIA cannot review and correct errors without the petitioner first providing her argument's relevant factual underpinnings.").

Here, Luchina failed to challenge the IJ's adverse credibility determination in both her notice of appeal and brief before the BIA. Her brief to the BIA makes two passing, contradictory references to the adverse credibility determination. *Compare* Administrative Record at 16 ("In his oral decision the Immigration Judge found that Respondent's testimony was not credible."), *with* Administrative Record

16

at 22 ("Nowhere in his decision did the Immigration Judge state that Respondent's testimony was not credible."). Her brief then characterizes her testimony as "credible" and argues that it was sufficient, along with the other record evidence, to establish both past and future persecution on account of her ethnicity. But the brief fails to address the reasons given by the IJ for making the adverse credibility determination or whether those reasons were supported by the evidence. As a result, the BIA never had an opportunity to consider the "relevant factual underpinnings" of the arguments she raises in her briefing to this Court. *See Indrawati*, 779 F.3d at 1298. Accordingly, we conclude that Luchina's conclusory and passing references to her credibility and the IJ's credibility finding are insufficient to her current challenge to the IJ's adverse credibility determination. *See Jeune*, 810 F.3d at 801 ("We therefore conclude that the conclusory statement in Petitioner's notice of appeal indicating that he had suffered past persecution 'as a gay man' was insufficient to exhaust (and thereby preserve) the specific and discrete arguments that he now makes in attacking the immigration judge's conclusion concerning the absence of a showing of past persecution.").

The fact that the BIA *sua sponte* addressed the adverse credibility determination does not cure the lack of exhaustion. *Amaya-Artuanduaga*, 463 F.3d at 1250. Reviewing issues that the BIA addresses *sua sponte* still frustrates the purposes of exhaustion. *See id.* at 1250–51. For instance, in this case, the BIA

17

addressed the credibility determination only in generic and vague terms.  The BIA was not presented with, and we do not know how it would have resolved, the specific arguments Luchina now raises in her petition for review.  *See id.*

For these reasons, we are constrained to conclude that Luchina failed to exhaust her challenge to the adverse credibility determination by raising the issue before the BIA.  *See id.* at 1250.  "[T]herefore, we lack jurisdiction to consider it under the clear dictates of circuit precedent."  *Id.*  Although the government did not press for dismissal on this basis, we have an obligation to consider our subject-matter jurisdiction whenever it may be lacking.  *See Lenis*, 525 F.3d at 1292.  Accordingly, we dismiss Luchina's petition for review as to this issue.

## B.    *Lack of Corroboration*

Luchina next argues that the IJ made an unreasonable demand for corroboration and inappropriately evaluated the corroborating evidence that she did submit.  She notes that she provided her birth certificate as well as evidence of country conditions, which was consistent with her testimony about her experiences in Moldova.  Additionally, she contends that she sufficiently explained the lack of medical records and police reports.

Again, however, Luchina failed to raise these arguments in her notice of appeal and brief to the BIA.  Before the BIA, she did not cite the corroboration requirement; she did not argue that the IJ unreasonably demanded corroborating

evidence; and she not contend that the IJ improperly assessed the corroborating evidence she did provide, apart from undeveloped assertions that the IJ selectively evaluated the evidence. Accordingly, as with her challenge to the adverse credibility determination, we must conclude that we lack jurisdiction to review Luchina's current arguments regarding the need for corroborating evidence. *See Amaya-Artuanduaga*, 463 F.3d at 1250.

## C.    *Past Persecution*

Luchina contends that she established past persecution and was entitled to a presumption—which the government did not rebut—that her life and freedom would be threatened if she returned to Moldova. She asserts that the IJ "mischaracterized or downplayed the incidents" in her testimony, failed to consider her claims as a whole, and inappropriately placed the burden on her to show that internal relocation was not reasonable.

However, because we lack jurisdiction to review the IJ's adverse credibility determination and his finding that corroborating evidence was required, substantial evidence supports the denial of Luchina's claim of past persecution. Luchina's claim of past persecution depended almost entirely upon her own testimony. Luchina offered no evidence to corroborate her account of the mistreatment to which she had been subjected while in Moldova, even if the country-conditions evidence was broadly consistent with her account. Accordingly, the IJ's adverse

19

credibility determination alone is sufficient to support the denial of Luchina's petition for review as to her claim of past persecution. *See Xiu Ying Wu*, 712 F.3d at 493; *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287–88 (11th Cir. 2005). We therefore do not address the IJ's alternative determination that, assuming her credibility, the mistreatment Luchina testified that she received in Moldova did not rise to the level of persecution.

### D.    Future Persecution

Finally, Luchina contends that she established a clear probability that her life or freedom would be threatened on account of her Roma ethnicity, if she is forced to return to Moldova. She contends that her testimony and the country-conditions evidence demonstrated systematic and pervasive abuse against the Roma population, which the Moldovan government is unwilling or unable to prevent.

"Our case law establishes that persecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Shi v. U.S. Att'y Gen.*, 707 F.3d 1231, 1235 (11th Cir. 2013) (internal quotation marks omitted). We have held that "persecution" means something "more than a few isolated incidents of verbal harassment or intimidation." *Sepulveda v. U.S. Att'y Gen*, 401 F.3d 1226, 1231 (11th Cir. 2005). (quotation marks omitted). "Mere harassment does not amount to persecution." *Id.* (alteration omitted) (quotation

marks omitted).    Thus, simple threats generally do not compel a finding of persecution.  *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1237 (11th Cir. 2006).

Substantial evidence supports the finding that Luchina failed to establish a clear probability of future persecution based on her ethnicity.  As discussed above, the record does not compel a finding of past persecution.  Therefore, Luchina had the burden to demonstrate a future threat to her life or freedom if she returned to Moldova.  *See Sanchez*, 392 F.3d at 437.  She could meet that burden in two ways: showing (1) "that there is a reasonable possibility he or she would be singled out individually for persecution, or [(2)] that [s]he is a member of, or is identified with, a group that is subjected to a pattern or practice of persecution."  *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1174 (11th Cir. 2008) (internal quotation marks omitted).    The record does not compel a conclusion that she has made either showing.

First, the record does not compel a conclusion that Luchina would be singled out for future persecution on the basis of ethnicity.  *See* 8 C.F.R. § 208.16(b)(2).  The only incidents from her testimony that suggested she might be personally targeted upon her return were the attacks on her brother and father.  But the attacker's threat—that it would not be good for her if she returned—was vague, and the IJ found that the attacker was motivated by her prostitution arrest, not her ethnicity.  *Cf. Djonda*, 514 F.3d at 1174 (holding that verbal threats combined with

21

a minor beating did compel a conclusion that the petitioner suffered persecution). Besides her discredited testimony regarding past instances of persecution, Luchina identifies no evidence that would compel a conclusion that she would be singled out for persecution based on her ethnicity if returned to Moldova.

Second, the record does not compel a finding that Luchina established that there is a pattern or practice of persecution against the Roma in Moldova. *See* 8 C.F.R. § 208.16(b)(2). A pattern or practice claim generally requires a showing that there is "a systematic, pervasive, or organized effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetrated or tolerated by state actors." *Mitreva v. Gonzales*, 417 F.3d 761, 765 (7th Cir. 2005) (internal quotation marks omitted).

In determining whether a pattern or practice of persecution exists, an IJ may rely heavily on the State Department country report. *See Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1354 (11th Cir. 2009). As the IJ recognized, the State Department report, like the other country conditions evidence, reflected that the Roma, who were among the most vulnerable minorities in Moldova, faced widespread discrimination in nearly all aspects of civil life and were occasionally targets of violence. Nevertheless, substantial evidence supports the IJ's finding that the level of discrimination did not rise to the level of a pattern or practice of persecution against all Roma in Moldova. For instance, the IJ's conclusion is

supported by the fact that Luchina's family remained in Moldova with no indication of persecution on account of their ethnicity after she left and that they were making at least enough money to send her to school and the United States. *See Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1259 (11th Cir. 2006) (stating that the petitioner's claim of future persecution "was contradicted by his testimony that his son and his parents have remained unharmed in the region of Colombia where [the petitioner] allegedly was threatened").

Moreover, substantial evidence supports the IJ's finding that the Moldovan government is not complicit in a pattern or practice of persecution. The report from the Roma National Center noted that the Moldovan constitution prohibited discrimination based on race or ethnicity, and that efforts had been made in legislation to foster equality and combat discrimination, although those efforts faced difficulties in practice. The State Department report described efforts by the Moldovan government to improve Roma access to public services by establishing mediators to serve Roma communities. And the BBC News article noted that most countries and the European Union as a whole had drawn up strategies to improve social inclusion for gypsies. In short, the record evidence does not compel a conclusion contrary to the IJ's.

We note that the IJ's conclusion on Luchina's pattern-or-practice claim is consistent with the holdings of other circuits to have addressed similar claims. *See*

23

*Gilca v. Holder*, 680 F.3d 109, 117 (1st Cir. 2012) (holding that the record supported the agency's finding that there was "no universal and systematic mistreatment" of the Roma in Moldova); *see also Georgieva v. Holder*, 751 F.3d 514, 523 (7th Cir. 2014) (upholding the agency's finding of no pattern or practice of discrimination against the Roma in Bulgaria, despite similar evidence that the Roma were "victims of pervasive discrimination in employment, education, health care, and housing, and are occasionally the targets of violence").

In sum, substantial evidence supports the agency's findings that Luchina did not establish a clear probability that she would be singled out for persecution or that there was a pattern or practice of persecution of the Roma in Moldova. Therefore, we deny her petition for review as to this claim.

## IV.  Conclusion

For the reasons stated, we dismiss Luchina's petition for review as to her challenges to the adverse credibility determination and the need for corroborating evidence.  We deny the petition as to her challenge to the agency's denial of her application for withholding of removal.

**PETITION DISMISSED IN PART; DENIED IN PART.**

24